The UNITED STATES of America, Appellant,

v.

The SIOUX NATION OF INDIANS et al., Appellees.

Appeal No. 16–74.

United States Court of Claims.

June 25, 1975.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellant.

Arthur Lazarus, Jr., Washington, D. C., atty. of record, for the Pine Ridge Sioux Tribe.

Marvin J. Sonosky, Washington, D. C., atty. of record, for the Rosebud Sioux Tribe, Standing Rock Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule Sioux Tribe and Santee Sioux Tribe.

William Howard Payne, Washington, D. C., atty. of record, for the Cheyenne River Sioux Tribe and the Sioux of the Fort Peck Reservation, Montana.

Before COWEN, Chief Judge, DURFEE, Senior Judge, DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

NICHOLS, Judge.

■ This appeal of the Indian Claims Commission's interlocutory order of February 15, 1974, raises essentially the question whether by the Act of February 28, 1877, 19 Stat. 254, and otherwise, the United States took the Sioux Nation's property in the Black Hills, South Dakota, by the power of eminent domain, or by a course of unfair and dishonorable dealing not amounting to a constitutional taking. In the former case interest is awardable as a part of just compensation and that is the answer of the Commission. In the latter it is not, and that is ours. Appellant admitted on oral argument it was only here to contest the interest. The following colloquy occurred:

> Judge Davis: * * * The difference really is, whether the Tribes will be entitled to interest on whatever the valuation is? The Commission came up with
>
> Gov't Atty.: 17 million dollars
>
> Judge Davis: Now, originally you were able to take it to wipe out the whole 17 million but now you're no longer able to do that?
>
> Gov't Atty.: Not on unconscionable consideration.
>
> Judge Davis: But now the whole difference is interest, whether they get paid the interest?
>
> Gov't Atty.: That's all we're arguing about.

■ The opinion below, 33 Ind.Cl. Comm. 151, reveals the facts giving rise to the instant claim. By the Treaty of April 29, 1868, 15 Stat. 635, 636, the United States confirmed in the Sioux Nation recognized title to all of the present South Dakota West of the Missouri River, and it agreed to keep unauthorized persons out. The Black Hills portion, acquired in 1877, contained 7,345,157 acres. In 1874 an exploration led by Lieutenant Colonel Custer discovered gold in this area. A large number of prospectors and miners thereafter entered it without consent of the Indians or other warrant of law, and pressure began to build to open the Black Hills to white settlement. At first the Army was stationed to keep the intruders out, but by motion of appellee, and without objection by appellant, we take judicial notice of certain documents which show that President Grant on November 3, 1875, secretly ordered the Army to make no further resistance to the miners going in. At the same time, he decided not to rescind orders theretofore issued forbidding them to occupy the Black Hills country, but in the absence of enforcement, this was ineffectual. The dependence of the Sioux on Government rations was relied on to prevent their making trouble.

The Government now decided to acquire the Black Hills from the Sioux, sending a Commission to negotiate, but it failed to reach agreement. In December 1875, the Government ordered all

Sioux back to their reservation by January 31, 1876, or be treated as hostile. Those outside were hunting and could not return in time; nevertheless the Army was sent to commence military operations against them. The famous defeat of Custer occurred on June 25, 1876. Incensed by this, Congress attached a rider to the Appropriation Act of August 15, 1876, cutting off the Sioux rations until they ceded the Black Hills. Since they could not hunt, until they yielded they would starve.

The Commission was unable nevertheless to get more than 10% of adult male Sioux to agree to cession. This was fatal to a legal acquisition by agreement, since Article XII of the 1868 Treaty provided that no cession of any part of the reservation should be valid unless three-fourths consented.

Congress by Act of February 28, 1877, 19 Stat. 254, resolved the impasse by enacting into law the unratified agreement of September 26, 1876. This yielded up the disputed territory. It included provisions respecting a contemplated removal to Indian Territory, not here relevant. It undertook to educate the Sioux and gave them a right to specified rations until able to support themselves. They had to remain impoverished to continue to enjoy the rations, a condition it seems they have satisfied down to the present day. There were also provisions for land allotments on the parts of the reservation not ceded.

Besides valuing the yielded land as of February 28, 1877 at $17,100,000, the Commission determined that the sum of $450,000 would compensate for the gold removed by miners before the taking date.

The instant claim has had a long history and, as an occasion for lawyers' work and effort, a distinguished one. For the Indians, it has been so far unrewarding. We consider it here to the extent necessary to evaluate appellant's *res judicata* defense.

By Act of June 3, 1920, 41 Stat. 738, the Congress provided a special jurisdiction for this court to adjudicate appellees' claims. It enacted:

\* \* \* That all claims of whatsoever nature which the Sioux Tribe of Indians may have against the United States \* \* \* may be submitted to the Court of Claims \* \* \* for determination of the amount, if any, due said tribe from the United States under any treaties, agreements, or laws of Congress, or for the misappropriation of any of the funds or lands of said tribe \* \* \* or for the failure of the United States to pay said tribe any money or other property due; and jurisdiction is hereby conferred upon the Court of Claims \* \* \* to hear and determine all legal and equitable claims, if any, of said tribe against the United States, and to enter judgment thereon.

Sec. 2. That if any claim or claims be submitted to said courts they shall settle the rights therein, both legal and equitable, of each and all the parties thereto, \* \* \*

■ The instant claim was presented as one among thirteen, and was dealt with, in a reported decision almost twenty-two years later. *Sioux Tribe of Indians v. United States,* 97 Ct.Cl. 613 (1942), *cert. denied,* 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943). Whether this decision was on the merits, and thus *res judicata* of the claim, or any portion thereof, or whether it merely held the court had no jurisdiction, is the somewhat bizarre question the parties have debated, below and here, and which we must now decide. All the rest of the claims were also dismissed for one reason or another.

■ After passage of the Indian Claims Commission Act, 25 U.S.C. § 70 and ff., in 1946 the then counsel for the Tribe in 1950 resubmitted the Black Hills claim. The theory then was unconscionable consideration and dishonorable dealings under § 70a(3) and (5). It was assumed then that the 1942 decision did not bar these claims by *res judicata* or collateral estoppel because claims under

paragraphs (3) and (5) were new causes of action that were moral in nature and not justiciable under the Special Jurisdictional Act of 1920. Defendant, however, stated in its answer that recovery was denied in the 1942 decision "for want of jurisdiction." Even if defendant had not altered its construction, obviously we would not take the parties' pleadings as binding us as to the meaning of our own reported decision. The Commission entered an order of dismissal and this court published an affirming opinion, 146 F.Supp. 229 (1956). The main reason for the position was that the consideration was not proven unconscionable because the Indians had persisted in trying to prove the value of the property taken from them by an improper method. The Indians by their then counsel admitted they had been paid more than the value of the property on the taking date.

The Indians at this point retained new counsel who obtained an order vacating our judgment of affirmance, for the Commission to reopen the proofs, and to reconsider its former decision if it saw fit to do so. 182 Ct.Cl. 912 (pub. in 1968). The Commission did reopen the proofs and did receive a quantity of new evidence. In 1961 we denied a petition by the Government for mandamus to prevent the Commission allowing the Indians to file an amended petition and for other extraordinary relief. See, *Sioux Tribe v. United States,* 500 F.2d 458, 205 Ct.Cl. 148 (1974).

■ Since the 1956 decision was withdrawn, we do not now treat it as determinative of anything.

■ The new decision of the Commission at 33 Ind.Cl.Comm. 151 (1974) is predicated on a theory of a taking by eminent domain, and the Commission would award interest as part of just compensation both for the land and for the pre-taking removal of gold by the miners. The Commission order contemplates a return of the case to it after our review for determination of offsets, but Congress later that year enacted in Pub.L. 93–494, 88 Stat. 1499, that there would not be any offsets for food, rations, or provisions. There are said to have been in contemplation not many other offsets. The Indians we hope are now near the end of the long and weary trail, but how much they realize on the claim turns wholly or almost wholly on the interest question, as it will be obvious, that interest over almost 100 years would many times exceed the principal. If we disagree with the Commission as to its taking theory the findings would justify liability under § 70a(5). The want of fair and honorable dealings seem obvious and this theory will support the award for pre-taking gold removal as well, since under this clause, with an obligation to protect once assumed, injuries inflicted by third parties are compensable. *Aleut Community v. United States,* 480 F.2d 831, 202 Ct.Cl. 182 (1973); *Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487 (1967).

■ In *United States v. The Goshute Tribe,* 512 F.2d 1398, 206 Ct.Cl. —— (1975), we consider the basis of a dishonorable dealings award under the Act. If the dealings were dishonorable, we held an award under clause (5) to be allowable even though the Commission might have made an award under some other sections also. As we there pointed out, resort to that section simplifies things by avoiding the necessity to measure whether consideration was conscionable. As the Congress does not want the rations to be used as offsets, *a fortiori* they should not come into the case by way of measuring the conscionability of consideration. If such a measurement had to be made, obviously, we think, the value of the expectations of rations in 1877 would be the value to be considered, and it would be impossible to determine that value, antecedently considered, because the Indians would terminate their right to rations whenever they became prosperous. No one in 1877 could have foreseen that the Sioux would always be poor, as the Commission rightly says. Thus impossibility of measurement makes "unconscionable consideration" inapt as a basis for liability.

We mention this court's requirement for a "special relationship" in *Goshute,* if dishonorable dealings liability is found. We say "Such a 'special relationship' arises when United States officials tender a Treaty to Indians for adhesion." (512 F.2d at 1400). A Treaty was tendered the Sioux for adhesion in 1876. However, breach of the obligation to protect the Indians' lands from unwanted intruders, as promised in the 1868 Treaty, reneged on another special relationship. The duplicity of President Grant's course and the duress practiced on the starving Sioux, speak for themselves. A more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history, which is not, taken as a whole, the disgrace it now pleases some persons to believe.

The Commission's taking theory founders on the bar of *res judicata.* As if doubtful of its reading of the 1942 case, the Commission strained to find an abandonment of this defense by the Government. Defendant did say in its pleadings that we held we had no jurisdiction in 1942, but explains it meant we had no jurisdiction of claims that were moral and not legal. Until after the remand by this court, the claim was actively prosecuted on the new moral grounds created by the 1946 Act. The Government shows it gave clear notice that it relied on *res judicata* as to any matters properly before the 1942 court. After 1969, when it was clear the Indians relied on a taking theory, the defendant debated the theory in full reliance on the 1942 case. We think the Commission should have accepted the Government explanation of its pleadings, as do we. When it came to write its decision it was well aware the 1942 decision had not been stipulated out of the case. Our policy, and the Commission's, has been to be lenient with the Indians as to whether their original petition allegations, filed before the jurisdictional cutoff, stated the claim on which they were ultimately to recover. It will not do, in cases under the same Act, to trap the Government in pleading allegations that were at best, ambiguous.

It must be a rare thing for a court to write findings and an opinion totalling 76 pages in length, all just to say it has no jurisdiction. This is, however, the Commission's position as to our 1942 decision. Indeed, the Commission really imputes a gross impropriety to this court in making a whole series of positive pronouncements on the legal rights of the parties—in a case over which it holds it has no jurisdiction! The best refutation would be to set forth the opinion at least, *in toto,* but we cannot on such a scale reprint material already available, in face of our over-large printing bills. It is no longer possible to follow the old practice of making such extensive quotes from prior opinions, as used to be usual. In this instance the opinion to be quoted also contains numerous long quotes from opinions still earlier which of course are all also directly available. Therefore we assume the interested reader will obtain our 1942 opinion. We set forth the rationale of that opinion, as we understand it, and next take up the specific passages that are alleged to reveal an admission of no jurisdiction.

The 1942 court, as we read it, analyzed the claim as moral rather than legal. The opinion starts out by saying the claim is for alleged taking for public purposes, or misappropriation, by defendant. The suit was specifically for just compensation, with interest, for an alleged taking, but the Government Acts relied on did not amount to an exercise of eminent domain in the court's view. The jurisdictional act did not authorize suit on moral claims. All it did was to remove statute of limitation bars, and bars against suits by Indian tribes, on previously existing rights.

The suit could not be maintained as for a taking because the facts brought the case under the line of *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) and not under the line of *Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); 304 U.S. 111, 58 S.Ct.

794, 82 L.Ed. 1213 (1938). The former case held that it was not a taking if the Congress, exercising its plenary power over Indian tribes, took their land without their consent and substituted for it something conceived by Congress to be an equivalent. Then it would be presumed that Congress acted in good faith for the Indians' best interests. The Court would inquire into neither the motives of Congress nor the sufficiency of the intended consideration, as to which Congress was the sole judge. The *Shoshone* line was explained as cases where the Indian land was taken and turned over to others without any real or purported equivalent.

Thus it was perfectly correct to say this court held it had no jurisdiction of "unconscionable consideration" and "dishonorable dealing" claims, these being moral and therefore outside the scope of the jurisdictional act. It is not correct to say it held it had no jurisdiction of the taking claim. The Act was broad enough to open the court to any legal claim, but it had to be a legal claim existing independent of the availability of a forum open to suit, for the jurisdictional act neither created nor enlarged pre-existing legal rights. The claim for a taking was well within the jurisdictional act, but the proofs, it was held, showed no taking. It would not have mattered if the jurisdictional act had been broader, so far as the taking claim was concerned. There was just no valid taking claim, whether a tribunal was provided for its enforcement or not.

■ It is necessary to understand that the right to just compensation in case of an eminent domain taking is conceived by the court to exist independently of whether the sovereign has provided any forum in which it can be sued.

In further explanation of the 1942 decision, it should be said that while refusing to determine the adequacy of the compensation proffered by the Government for the land, the court was manifestly impressed by the found fact that the expenditure for rations for the Sioux had already reached the figure of $43,-000,000, a substantial sum in those days. This court, too, in considering the moral claims in the withdrawn 1956 decision, deemed the consideration for the land more than adequate. It never apparently occurred to the court either time that the rations were to compensate, not for the land, but for prior destruction of the Indians' mode of subsistence, as found by the Congress in enacting Pub.L. 93–494, *supra, U.S. Code Cong. & Admin. News,* 93d Cong.2d Sess. 6112–6115 (Senate Rep.) A few years ago this court, in an effort to synthesize the *Lone Wolf v. Hitchcock* and the *Shoshone* lines of cases, suggested that in cases of purported exercise of trusteeship control over Indian affairs, and purported substitution of one property right for another, the test to bring a case into the *Lone Wolf* line is whether Congress made a "good faith effort" to ascertain and obtain for the Indians the value of the land. *Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 390 F.2d 686, 691, 182 Ct.Cl. 543, 553 (1968). In our 1942 decision this test is not articulated, and whether if it had been the same result would have been reached is far from obvious, but need not be and is not considered here, since, as will appear, the bar of *res judicata is* not lifted if a later court disagrees with a prior one.

We now consider the passages in the 1942 decision relied on by the Commission to establish that this court held it had no jurisdiction even of the taking claim.

The first quotation at 33 Ind.Cl.Comm. 199, is from the court's introductory statement at p. 616. It is twisted by the Commission into an admeasurement of our jurisdiction. This quotation from the 1942 opinion says the question is:

* * * whether, as a matter of law, the plaintiff tribe has a legal or equitable claim under section 1 of the Jurisdictional Act * * *

This was not intended as a discussion of the scope of the Act referred to. The court does this elsewhere and shows that in its opinion the special Jurisdictional

Act created no new rights but granted jurisdiction of any legal claim that existed previously, and only wanted a tribunal in which the United States consented to be sued. It cannot therefore mean, as the Commission apparently would have it, that section 1 of the Jurisdictional Act is to be looked to as somehow the source of the claim. The court said at p. 666:

In the case at bar the jurisdictional act, except so far as concerns the competency of the Indian tribe to sue and the limitation on our general jurisdiction under section 259, title 28, U.S.C., as well as the statute of limitation, created no new right or claim in favor of the tribe not otherwise within the limits of our general jurisdiction.
* * *

The second, 33 Ind.Cl.Comm. 199, is from p. 658 of the opinion. It says:

The facts and circumstances narrow the legal issue * * * to the question whether * * * the plaintiff tribe *has any legal and enforceable claim * * * upon which the court has authority to inquire into the wisdom of the policy pursued by the Government, * * * and the adequacy of the consideration assumed * * ** [Emphasis added by ICC.]

This passage is taken out of context and read with the context it means that once the taking claim is eliminated, all that then remains is whether the court can pursue impermissible inquiries in enforcement of a moral claim. It does not deal with the taking claim based on a violation of property rights created by treaty.

The quote at 33 Ind.Cl.Comm. 200, from the 1942 opinion, at 657–58, is representative but misunderstood. It is worth setting forth in full:

If the lands or other property rights of plaintiff were misappropriated or taken by the United States *in violation of the treaty of 1868, and contrary to the authority which Congress possessed under the treaty and the law governing the rights of the parties,* without the payment of compensation therefor and under such circumstances as to give rise to an implied contract to pay just compensation for the property taken contemporaneously with the misappropriation or taking, plaintiff is entitled to recover. *But if,* under the circumstances disclosed by the record, *Congress acted within the limits of its authority under the law and the treaty* in acquiring the lands and hunting rights for which it made compensation, *the plaintiff is not in our opinion entitled under the terms of the jurisdictional act to recover.* [Emphasis added by ICC.]

This considers both alternatives. If plaintiffs can prove a taking claim, they can recover. But if Congress acted within its legal rights, they cannot. This shows clearly that the special jurisdictional act covered the taking claim, as we now hold.

The quote at 33 Ind.Cl.Comm. 201 explains the jurisdictional act just as we have above, *i. e.,* that it created no new legal right but only removed the bar on the Indians suing.

The first quote at 33 Ind.Cl.Comm. 202 agrees with our analysis, saying that in light of established legal principles the plaintiffs cannot recover as for a taking.

The Commission's second quote on that page is from p. 667 of the court opinion. The court said that the 1868 treaty and the 1877 act are not laws giving a valid foundation to the claim. From this the Commission draws the staggering *non sequitur* that the court believed it had no jurisdiction to hear a claim based on violation of rights the Sioux possessed under the Constitution. Of course, the Fifth Amendment, the part of the Constitution involved, protects property rights made valid by some other law. The Commission cannot think the Fifth Amendment created the property rights it shelters, and surely would not be surprised to learn there were property rights before there was a Fifth Amendment, we are sure.

In its quote from the court opinion, p. 668, at 33 Ind.Cl.Comm. 204 the Commis-

sion confuses the jurisdiction of the court with the Indians' "legal right to complain", concepts the court carefully separated, and also confuses the right of the court to pass upon the justness and fairness of what Congress did, *i. e.,* the moral claims, with its right to adjudicate the taking claim, which the court had and exercised.

The series of quotes at 33 Ind.Cl. Comm. 206, 207, need not be analyzed in detail. They all are consistent with our view that the court considered it had jurisdiction of a taking claim, but the Indians failed to prove a taking claim, and that it had no jurisdiction of moral claims, which were all the Indians proved, if they proved anything.

The Commission refers to *Winnebago Tribe of Indians v. United States,* 100 Ct.Cl. 1 (1942), as confirming its understanding of the *Sioux* case. It follows the latter case and we think the Commission has misunderstood it in the same way.

See also discussion of the 1942 case in *Sioux Tribe v. United States,* 64 F.Supp. 312, 105 Ct.Cl. 725, 776–78 (1946), *on pet. for cert. judgment vacated,* 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1947) reciting over three pages the court's handling of the taking claim in the 1942 case, and nowhere thinking to mention the court refused to take jurisdiction of that claim.

Chairman Kuykendall, dissenting, points to the withdrawn decision, *Sioux Tribe v. United States,* 146 F.Supp. 229, 239 (Ct.Cl.1956), wherein this court, then comprised of four of the judges who sat on the 1942 case, and one other, held that Category (2) claims under the Indian Claims Commission Act, 25 U.S.C. § 70a could not be brought by the Sioux because adjudicated unfavorably to them in the 1942 decision. This gives perhaps cumulative support to a conclusion more comfortably based on other grounds.

■ It is elementary that in Indian Claims Commission Act proceedings a former decision on the merits by a court having jurisdiction is a *res judicata* bar to further litigation of the same claim. *United States v. Southern Ute Tribe,* 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971); *Assiniboine Indian Tribe v. United States,* 121 F.Supp. 906, 128 Ct.Cl. 617, *cert. denied,* 348 U.S. 863, 75 S.Ct. 88, 99 L.Ed. 680 (1954). *Res judicata* was defined in *Cromwell v. County of Sac,* 94 U.S. 351, 352–3, 24 L.Ed. 195 (1876), in the following terms by Mr. Justice Field:

In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. *It ·is a finality as to the claim or demand in controversy,* concluding parties and those in privity with them, *not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.* Thus, for example, a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and the amount due upon it, although it be subsequently alleged that perfect defences actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defences were not presented in the action, and established by competent evidence, the subsequent allegation of their existence is of no legal consequence. The judgment is as conclusive, so far as future proceedings at law are concerned, as though the defences never existed. The language, therefore, which is so often used, that *a judgment estops not only as to every ground of recovery or*

*defence actually presented in the ac-tion, but also as to every ground which might have been presented, is strictly accurate, when applied to the demand or claim in controversy.* Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.

The difference in the operation of a judgment in the two classes of cases mentioned is seen through all the leading adjudications upon the doctrine of estoppel. (Emphasis supplied).

This classic comparison of *res judicata* (same claim) and collateral estoppel (different claims) still provides a current, valid definition of *res judicata. Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326 n. 6, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *United States v. Moser,* 266 U.S. 236, 241, 45 S.Ct. 66, 69 L.Ed. 262 (1924).

Although hard, the doctrine that even erroneous decisions have *res judicata* effect is ancient in American law and of highest authority. *See, Williams v. Armroyd,* 11 U.S. (7 Cranch) 423, 432–33, 3 L.Ed. 392 (opinion by Chief Justice Marshall) (1813); *Milliken v. Meyer,* 311 U.S. 457, 462, 61 S.Ct. 339, 85 L.Ed. 278 (1940); *Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 373–76, 60 S.Ct. 317, 84 L.Ed. 329 (1940).

Nor do any escape hatches appear. Unlike *Lawlor, supra,* there is no conduct by the parties subsequent to 1942 to create a new cause of action. And unlike *Oerlikon Machine Tool Works Buehrle & Co. v. United States,* 102 F.Supp. 417, 121 Ct.Cl. 616 (1952), vacated on other grounds, 151 F.Supp. 332, 138 Ct.Cl. 457 (1957), all of the necessary facts were pleaded in the original suit.

Since in 1942 this court did, rightly or wrongly, hold on the merits, in a cause it had jurisdiction of, that the Sioux did not have a valid claim against the United States on account of the taking of Black Hills, and since it also held it had no jurisdiction of moral claims relating to the same matter, and since in waiving other defenses the Congress did not waive *res judicata* defenses in the Indian Claims Commission Act, the Sioux are now restricted to moral claims under categories (3) and (5) of Sec. 70a, on which interest cannot be awarded as part of just compensation. The Congress which wiped out the rations offset could correct this situation also, but we are without the power to do so. On the ground of dishonorable dealings under category (5), the record made supports the Commission's Order except as to interest, but including the pre-taking removal of gold by miners. The cause is remanded for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part and remanded.*

DAVIS, Judge (dissenting in part):

I disagree with the court's holding that the decision in 97 Ct.Cl. 613 (1942), *cert. denied,* 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943), is *res adjudicata* of

the Fifth Amendment taking claim now presented by the Sioux Nation.[1]

It is not easy to apply the general principles of former adjudication to this court's decision in 97 Ct.Cl., and both sides can readily cite different parts of that opinion which appear to support the respective positions. The key, as I see it, is that the 1942 court separated an Indian Fifth Amendment claim into two distinct parts—the first being whether there was any "taking" or "misappropriation" at all, and the other being the amount of compensation to be paid by the Government for the "taking." The court thought it had power, under the normal jurisdictional act, to determine the former issue but, in considering whether the constitutional measure of "just compensation" had been paid for the "taking", the court felt that it had no competence to weigh or take account of the consideration given the Indians by the United States unless the special jurisdictional act so provided in explicit terms—which in this instance it did not. On this view, the court refused to assess at all the money or value given by the Government in exchange for the Black Hills. It would not decide, because it believed it could not, whether or not this consideration amounted to "just compensation."

The rule we apply today is quite different. In Indian Fifth Amendment cases, we now take account of, and assess, the consideration given by the United States in deciding whether "just compensation" has been given. *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 390 F.2d 686, 182 Ct.Cl. 543 (1968); *Klamath and Modoc Tribes v. United States*, 436 F.2d 1008, 1017 n. 25, 193 Ct.Cl. 670, 689 n. 25, *cert. denied*, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971); *Confederated Sal-ish and Kootenai Tribes v. United States*, 437 F.2d 458, 459–60, 193 Ct.Cl. 801, 805 (1971). For purposes of *res judicata*, the formal issue thus becomes whether this is simply a change, since 1942, in the substantive law of just compensation for Indians or whether it is attributable to a liberalized view of the authority given the courts by the jurisdictional statutes consenting to suit against the United States on Indian Fifth Amendment claims.

This is a difficult question to answer but I prefer the latter response—the so-called "jurisdictional" response [2]—mainly because, in my view, that is the stance taken, on the whole, by the 1942 court. The opinion repeatedly ties its refusal to assess or weigh the consideration (given by the United States) directly to the particular jurisdictional act. *See* 97 Ct.Cl. at 616 (this forms part of the court's opinion, as is made clear by the fore-word, on the same page, to the findings of fact), 657–58, 658, 666, 668, 670, 681, 681–82, 682–83, 683, 685. The court also spends some time emphasizing the strict construction to be given to special jurisdictional statutes. *See* 97 Ct.Cl. at 663–65, 682. Implicit in the whole opinion seems to be the notion that, except where consent to suit is given without qualification for suits against Government corporations (97 Ct.Cl. at 664–65), there is both a general presumption against suability of the United States, and also a special presumption against opening up, for judicial scrutiny, Indian claims challenging a congressional policy deemed at the time to be for the welfare of the Indians (97 Ct.Cl. at 665). The court's position was that "when Congress has desired to open up [the latter type of] claims * * * it has used language clearly indicating that purpose" (*Ibid.*).

---

1. I concur in the court's other rulings, including that the United States is not precluded from raising the defense of *res judicata*.

2. If the 1942 decision was based on a lack of jurisdiction in this court, under the then special jurisdictional act, to take account of the consideration transferred by the Government, *res judicata* is inapplicable because, in that case, the earlier court would have felt precluded by a lack of jurisdiction from delving into one of the significant elements of the Fifth Amendment claim. See A.L.I., Restatement of the Law Second Judgments, Tent.Draft No. 1, § 48.1(1)(a), § 61.2(1)(c), pp. 45, 123, 127–130 (1973).

This symbiotic relationship between the terms of the jurisdictional act and the court's right to inquire into the extent and adequacy of the consideration is brought out, I think, by two sections toward the close of the 1942 opinion. In one the court says (97 Ct.Cl. at 681–82):

Plaintiff's position in substance is that one party to a proposed transaction cannot legally fix the terms or consideration and force the other party to accept them. This is true in transactions between private parties dealing at arm's length and on terms of equal authority, but this legal proposition does not follow in dealings between the Government and Indian Tribes so as to enable the Indians to question in a legal proceeding the policy, wisdom, or authority of Congress, *unless Congress has clearly granted to the Indians the right to do so* [emphasis added]. In our opinion this has not been done for "the [jurisdictional] act grants a special privilege to the plaintiffs and is to be strictly construed and may not by implication be extended to cases not plainly within its terms"— [citing cases]. To hold otherwise, it would be necessary for us to go back of the acts of August 15, 1876, and February 28, 1877, and inquire into the policy as well as the judgment and wisdom of Congress which prompted it to act as it did and, therefore, adjudicate and render judgment either for or against the Indians on a moral claim. We cannot find that authority in the jurisdictional act.

The second excerpt reads as follows (97 Ct.Cl. at 683–84):

In reaching this conclusion we have kept in mind the principle of law that while the government always has the right to take or appropriate any private property for a public use, if it does so, without claim of title and without compensation, there arises an implied contract under the Fifth Amendment, and, therefore, a legal claim for just compensation. * * * But before this general rule is applicable to Indian cases, consideration must be given to the question of policy and the extent of the plenary authority of Congress to legislate in such a way as it deems proper with reference to the management and control of the property and affairs of the Indian tribes *and the extent to which consent to be sued has been granted* [emphasis added], as well as to the circumstances and conditions under which an implied contract will arise under the Fifth Amendment. The facts must show *not only* that there has been a "taking" or "misappropriation" by the Government of land or property of the tribe under such circumstances as will give rise to an implication of a promise or undertaking to make "just compensation" [citing case] *but that Congress has, by the jurisdictional act, which speaks only of legal claims, opened up the question of the fairness of what was done or of the adequacy of the consideration paid, and has authorized the court to determine, adjudicate, and render judgment accordingly* [emphasis added].

True, the opinion speaks, in the first of these excerpts, of "a moral claim." But this seems to me to be because the court automatically equates claims which cannot be vindicated under the jurisdictional act—because that act should not be read as authorizing an inquiry into fairness of consideration—as necessarily "moral" claims. That does not mean that, in the court's eyes, these claims would fail under the Fifth Amendment if full consent had been given. The latter part of the second excerpt clearly separates the issue of a Fifth Amendment "taking" from that of an inquiry into fairness—and requires that Congress authorize *both* aspects. "The facts must show *not only* that there has been a 'taking' or 'misappropriation' by the Government of land or property of the tribe under such circumstances as will give rise to an implication of a promise or undertaking to make 'just compensation' [citing case], *but that* Congress has, by the jurisdictional act, which speaks only of legal claims, opened up the ques-

tion of the fairness of what was done or of the adequacy of the consideration paid, *and* has authorized the court to determine, adjudicate, and render judgment accordingly" [emphasis added]. A separate, special authorization in the jurisdictional act to go into the fairness of the compensation seems to be required. The court, in a word, thought it had the jurisdiction to decide whether there had been a "taking" but no jurisdiction to determine whether the compensation paid by the Government was "just." [3]

In the end, the best I can make of the 1942 opinion is that the terms of the jurisdictional act were so entangled in the court's mind with its ultimate determination adverse to the Indians on the Fifth Amendment claim that the Government should fail in its current defense of *res judicata*. The "jurisdictional" component seems to me to have been too large a factor in the 1942 holding to preclude the Nation from its right to show now that the acquisition of the Black Hills was a Fifth Amendment taking, without just and adequate compensation, rather than merely a violation of fair and honorable dealings. I am not persuaded that in 1942 the Indians had the opportunity to present their Fifth Amendment claim to a tribunal which deemed itself fully empowered to decide all aspects of that demand on their merits.[4]

3. The same theme seems to be reflected at the beginning of the opinion when the court says (97 Ct.Cl. at 657–58):

"If the lands or other property rights of plaintiff were misappropriated or taken by the United States in violation of the treaty of 1868, and contrary to the authority which Congress possessed under the treaty and the law governing the rights of the parties, *without the payment of compensation therefor and under such circumstances as to give rise to an implied contract to pay just compensation for the property taken contemporaneously with the misappropriation or taking,* plaintiff is entitled to recover. But if, under the circumstances disclosed by the record, Congress acted within the limits of its authority under the law and the treaty in acquiring the lands and hunting rights *for which it made compensation,* the plaintiff is not in our opinion entitled under the terms of the jurisdictional act to recover [emphasis added]."

Note that the court separates the case in which Congress pays no "compensation" from that in which it does pay some "compensation," without suggesting that the court can, under this jurisdictional act, decide whether the "compensation" paid was "just."

4. Since the court does not reach the question of whether, *res judicata* aside, the acquisition would be such a "taking" without just compensation, I do not reach or discuss that issue.