**SIOUX NATION OF INDIANS et al.**

v.

**The UNITED STATES.**

No. 148–78.

United States Court of Claims.

May 20, 1981.

See also Ct.Cl. 601 F.2d 1157.

Arthur Lazarus, Jr., Washington, D. C., attorney of record, for plaintiff; Fried, Frank, Harris, Shriver & Kampelman, Marvin J. Sonosky, Sonosky, Chambers & Sachse, and William Howard Payne, New York City, of counsel.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and DAVIS, NICHOLS, KUNZIG, BENNETT and SMITH, Judges, en banc.

## OPINION

FRIEDMAN, Chief Judge:

This is a motion for attorneys' fees made by Arthur Lazarus, Jr., attorney of record for the Sioux Nation of Indians,[1] on behalf of all the attorneys seeking a fee. The attorneys are requesting $10,595,943, which is 10 percent of the $105,994,430.52 judgment we awarded the Sioux Nation in *Sioux Nation of Indians, et al. v. United States*, 220 Ct.Cl. ——, 601 F.2d 1157 (1979), *aff'd*, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), less a $3,500 retainer previously paid to one of the attorneys. We award the requested attorneys' fees.

### I.

A. The claim the attorneys successfully prosecuted in this case grew out of the action of the United States in acquiring the Black Hills portion of the Sioux Reservation in 1877. The Sioux Reservation had been established under the Fort Laramie Treaty of April 29, 1868, 15 Stat. 635 (1869). The facts relating to that acquisition are detailed in our 1979 opinion. We there held that an 1877 statute by which the United States acquired the Black Hills constituted a taking of those lands under the fifth amendment, for which the Sioux were entitled to receive just compensation.

B. This case began in a suit the Sioux filed in this court in 1923, pursuant to a 1920 special jurisdictional act authorizing us to adjudicate Sioux claims against the United States "under any treaties, agreements, or laws of Congress." Act of June 3, 1920, 41 Stat. 738. The suit alleged that the United States had taken the Black Hills from the Sioux without paying them just compensation. Almost 20 years later we dismissed the suit, holding that under the special jurisdictional act the Sioux were "not entitled to recover from the United States as for a 'taking' or 'for the misappropriation of any lands of said tribe.'" *Sioux*

*Tribe of Indians v. United States*, 97 Ct.Cl. 613, 666 (1942), *cert. denied*, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943).

Following the enactment of the Indian Claims Commission Act in 1946, 60 Stat. 1049, 25 U.S.C. § 70 *et seq.*, the Sioux, in 1950, filed with the Indian Claims Commission the same Black Hills claim. They alleged that the United States had paid them an unconscionable consideration and had not engaged in fair and honorable dealings, which were two of the types of claims over which the Commission had jurisdiction. 25 U.S.C. § 70a(3) & (5). The Sioux, however, did not allege that the government's acquisition of the Black Hills constituted a fifth amendment taking, even though the Commission also had jurisdiction over taking claims. 25 U.S.C. § 70a(4).

In 1954, the Commission dismissed the petition on the ground that the Sioux had failed to prove their case. *Sioux Tribe v. United States*, 2 Ind.Cl.Comm. 646 (1954). On the basis of lengthy findings (*id.* 646–70), the Commission concluded

> that there is no basis for a claim or claims by the plaintiffs that the compensation provided for the Indians under the Act of February 28, 1877, was inadequate or unconscionable, or that the defendant was guilty of unfair or dishonorable dealings, or failed in its duty to the plaintiff Indians.

*Id.* 682–83.

In 1956, we unanimously affirmed the Commission's dismissal of the Sioux's claims. 146 F.Supp. 229.

All of this prior litigation was handled by attorneys other than those now seeking fees.

C. Following our affirmance of the Commission's dismissal of the claim, three tribes of the Sioux approached two of the present attorneys to take over the litigation. Even before the new counsel were formally retained, they assisted the Sioux in

---

1. All of the attorneys involved have agreed among themselves as to the division of any attorneys' fees received. The principal attorneys involved in this litigation are Arthur Lazarus, Jr., of Fried, Frank, Harris, Shriver & Kampelman, Marvin J. Sonosky of Sonosky, Chambers & Sachse, and William Howard Payne. Collectively, they will be referred to as the "attorneys."

preparing motions to extend the time for seeking a rehearing of, or other relief from, our November 1956 decision, to prevent that ruling from becoming final. The attorneys entered into representation contracts with eight tribes of Sioux, who acted in a representative capacity for the Sioux Nation. All of these contracts were for an initial term of 10 years. All of them have been extended—three to 1982, one to 1981, three to 1980, and one to 1977. The last has not been extended past that time. All of the contracts initially were approved in 1957 and 1958 by appropriate officials of the Department of the Interior. All of the contracts initially provided that the attorneys would receive a fee not exceeding 10 percent of any amount recovered; one of them subsequently was amended to provide for a flat fee of 10 percent.

In October 1957, the attorneys filed a motion to vacate our 1956 decision, which the government vigorously opposed. In November 1958, we remanded the case to the Commission to determine whether proof should be reopened and, if so, to reconsider its prior decision. Two weeks later, the Commission reopened the proof.

Almost 4 years later, in November 1960, the Commission granted the plaintiffs' request to amend their petition to include a claim for "just compensation under the Fifth Amendment."

After procedural skirmishing, the government, in June 1961, moved to dismiss the case for failure to state a claim upon which relief could be granted. The Commission denied that motion in January 1962. The government did not answer the amended petition until the Commission directed it to do so in May 1966.

Between 1962 and 1968, this case remained largely dormant while another Sioux case was being tried and briefed. During that period, however, the attorneys conducted extensive factual and legal research in the National Archives, the Library of Congress, and State historical societies. In February 1968, the attorneys filed a motion for an order defining the questions for determination. After oral argument, the Commission set a briefing schedule on the three questions the attorneys framed. Both sides filed further briefs on the value of the Black Hills and the consideration the government paid for that land.

A trial on the issue of valuation was held in November 1969 and May 1970, at which both sides presented expert witnesses and extensive valuation reports. After proof was closed, both sides filed detailed proposed findings of fact and supporting briefs; the plaintiffs' proposed findings totalled 194 pages and a supporting brief 48 pages, and the government filed a combined document totalling 183 pages. The plaintiffs' attorneys filed a 117-page document in reply.

There was further procedural skirmishing between the plaintiff and the government. In December 1973, the Commission heard oral argument, and rendered its decision in February 1974. 33 Ind.Cl.Comm. 151. The opinion and findings comprised 212 pages.

The Commission held (1) that our 1942 decision was not *res judicata* on the taking issue; (2) that the government's acquisition of the Black Hills in 1877 constituted a taking for which the Sioux were entitled to just compensation, including simple interest at 5 percent. The Commission found that the value of the land taken was $17,553,484. The Commission further ruled, however, that the United States was entitled to offset against the taking award the value of the food, rations, and provisions it had furnished to the Sioux pursuant to the 1877 Treaty.

The plaintiffs' attorneys concluded that this offset probably would reduce the net award to the Sioux to approximately $4 to $6 million. They decided that the only way to secure a larger award for the Sioux would be to obtain an amendment of the Indian Claims Commission Act to exclude these items from the category of allowable offsets.

During the next 6 months plaintiffs' attorneys engaged in extensive efforts in Congress and with the President's advisors on Indian affairs. In the fall of 1974, Con-

gress amended the Indian Claims Commission Act to bar offsets for "food, rations and provisions," and President Ford signed the bill. Act of Oct. 27, 1974, Pub.L.No.93–494, 25 U.S.C. § 70a (1976).

At the same time that these activities were taking place in Congress, the government's appeal from the Indian Claims Commission award went forward before this court. Lengthy briefs were filed, and we heard oral argument. In June 1975, we held that our 1942 decision was *res judicata* on the Sioux's claim for just compensation, thereby reversing the Commission determination that the Sioux were entitled to interest. We did, however, affirm the Commission's award of approximately $17.5 million for the value of the land made under the dishonorable dealings provision of the Indian Claims Commission Act. *See United States v. Sioux Nation of Indians*, 207 Ct.Cl. 234, 518 F.2d 1298, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

For the second time, the attorneys sought recourse in Congress. Four days after the denial of certiorari, Senator Abourezk introduced a bill, drafted by the attorneys, authorizing us to hear the *Sioux* case without regard to the defenses of *res judicata* or collateral estoppel. Considerable problems were encountered in Congress, and extensive efforts again were necessary. The bill finally was signed into law in March 1978, 27 months after it was introduced. Act of March 13, 1978, Pub.L.No. 95–243, 25 U.S.C. § 70s (Supp. II 1978).

After extensive briefs were filed, this court *en banc* (two judges dissenting) affirmed the Commission's decision that the 1877 Act had effected a taking of the Black Hills. *Sioux Nation of Indians v. United States*, 220 Ct.Cl. ——, 601 F.2d 1157 (1979). The result was an award of just compensation to the Sioux of $105,994,430.52. This was the largest award made under the Indian Claims Commission Act. The Supreme Court reviewed the case and, after extensive briefing, on June 30, 1980, affirmed our decision. 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844.

On July 22, 1980, $105,994,430.52 was credited by the Secretary of the Treasury to the Sioux's account.

## II.

A. The award of attorneys' fees for services rendered under the Indian Claims Commission Act is governed by section 15 of that act, 25 U.S.C. § 70n (1976), which provides:

> The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question . . . shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case.

Upon termination of the Indian Claims Commission in 1978, that agency's authority to fix attorneys' fees was assigned to this court. 25 U.S.C. § 70v (1976).

In fixing fees under this statute, we have considered the following factors:

(1) The nature of the undertaking and the character of the services required.

(2) The responsibility assumed.

(3) The professional repute, standing, ability, and experience of counsel.

(4) The services rendered, including the time and labor required.

(5) The magnitude and importance of the cases.

(6) The novelty and difficulty of the questions involved.

(7) The opposition encountered.

(8) The results accomplished and the benefits flowing to the clients.

(9) The professional competence displayed, including skill, industry, and diligence.

(10) The fidelity of counsel to the interests of their clients.

(11) The contingent nature of the employment and the hazards and risks involved.

(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded.

(13) Customary charges and going rates of attorneys for similar services. *Cherokee Nation v. United States*, 174 Ct.Cl. 131, 146–47, 355 F.2d 945, 953–54 (1966), quoting from *Confederated Bands of Ute Indians v. United States*, 120 Ct.Cl. 609, 667 (1951).

B. The attorneys rendered outstanding services in this case. They took over a moribund law suit, resuscitated and successfully prosecuted it in the face of enormous difficulties, and recovered for the Sioux the largest award that has been made under the Indian Claims Commission Act.

The odds against success when the lawyers entered the litigation in 1956 were overwhelming. The Sioux already twice had lost their case—in 1942 when we had rejected the taking claim, and in 1956 when we had affirmed the Commission's dismissal of the non-taking claims. If our decision had become final, the only hope of the Sioux would have been to have obtained a reversal of that decision in the Supreme Court, and that likelihood was minimal. Moreover, even if the attorneys could have vacated both our decision and the Commission's determination that we had approved, the probability of ultimately recovering before the Commission was extremely low. As of that time, the Commission had ruled in favor of the Indian claimants in only 16.5 percent of the cases it had decided, and those awards had been relatively small.[2] In sum, the attorneys took over a case that

most lawyers reasonably would have viewed as virtually hopeless.

From this inauspicious beginning, the attorneys accomplished a remarkable achievement. They convinced us to vacate our decision, persuaded the Commission to reopen the case, and convinced the Commission to permit them to introduce into the case the taking claim that we had rejected in 1942. On the basis of extensive historical and legal research and the development of expert evidence, the attorneys presented to the Commission a convincing case with respect to both the value of the Black Hills in 1877 and the taking of that property by the United States. These endeavors culminated in the Commission's decision of February 1974 that the United States had taken the Black Hills and that the Sioux were entitled to recover approximately $17.5 million plus interest of approximately five times that amount. The major portion of this victory was lost, however, when 16 months later we held that our 1942 decision was *res judicata* on the taking claim and that the Sioux were entitled to recover only the $17.5 million, but not the much larger amount of interest the Commission had awarded.

In the period between the two decisions, the attorneys, through skilled activities before the Congress, were able to obtain an amendment of the Indian Claims Commission Act that barred offsets against awards for the value of food, rations, and provisions. Without this legislation, the offsets in this case probably would have eliminated most of the $17.5 million the Commission had held was the value of the land the United States had taken from the Sioux in 1877.

After our 1975 decision, the attorneys again were able to obtain legislative assistance for the Sioux. The 1978 law, which Congress enacted as a result of many months of work by the attorneys, authorized us to consider the Sioux's taking claim without regard to *res judicata* or collateral

2. Through June 30, 1958 (by which time most of the attorneys' representation contracts with the Sioux tribes had been executed and approved), the Commission had held for the Indi-

ans in only 15 cases and had held against them in 76 cases. The total amount awarded in the 15 cases was $17,088,586, an average of $1,139,239.

estoppel. There was strong opposition to this legislation and on a number of occasions it appeared that it would fail, but the attorneys' perseverance and effectiveness ultimately prevailed. The attorneys then filed lengthy, scholarly, and convincing briefs before us on the taking issue, and argued the case before us. After we had upheld the Sioux's contention by a divided court, the attorneys successfully defended that result in the Supreme Court.

Throughout this litigation, the attorneys were vigorously opposed by the Department of Justice. Unlike some other Indian claims cases (*see, e. g., Confederated Bands of Ute Indians v. United States, supra,* 120 Ct.Cl. at 679–82), the outcome of this case was uncertain and dubious until the Supreme Court finally held in favor of the Sioux in 1980, more than 20 years after the attorneys' representation of the Indians had begun.

The result the attorneys have obtained for their clients has been extraordinary. Starting with a case that appeared doomed, they obtained an award of more than $100 million—which is more than twice as large as any other made in an Indian claims case. Both the attaining of any award and the

magnitude of the award made were attributable solely to the endeavors of the attorneys. Considering all the circumstances— the nature of the case, the obstacles the attorneys had to overcome, the low initial prospect of success, and the great skill and dedication with which the attorneys did their work—we conclude that attorneys' fees of 10 percent of the award,[3] or $10,595,943, are appropriate.[4]

This is the largest award of attorneys' fees in an Indian claim. It is more than twice the previous highest award—the $4,737,662.29 we awarded to the attorneys in *Turtle Mountain Band of Chippewa Indians, et al. v. United States,* Nos. 113, 246, 191, and 221 (order entered November 21, 1980), which was 10 percent of the partial judgment in that case. In view of the outstanding services rendered and the outstanding results achieved in this case, however, the large fee here is fully justified and is necessary to compensate the attorneys adequately for their services. Here, as in *Turtle Mountain,* "we do not think that the absolute amount of the award is so large as to merit paring of the ten percent allowance." *Id.* 4.[5]

---

**3.** The United States has "take[n] no position with respect to the amount of attorneys' fees," and the Department of the Interior has stated that it does not have "sufficient detailed information upon which to make a recommendation" respecting attorneys' fees.

The government, however, suggests that in setting attorneys' fees, we consider separately the attorneys' efforts in securing (1) the principal amount of $17,553,484, which we approved in 1975, and (2) the interest of $88,440,946.52.

We decline to do so. From the outset, the attorneys' principal contention was that there had been a taking and that just compensation (including interest) should be awarded. The two elements cannot properly be separated merely because the attorneys initially did not prevail on the taking claim. *See Blackfeet and Gros Ventre Tribes v. United States,* 127 Ct.Cl. 807, 813, 119 F.Supp. 161, 164, *cert. denied,* 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 (1954), where we stated that "the right to interest as an element of just compensation under the Fifth Amendment is inseparable from the claim for the principal value of the land—they arise at the same time—from the same source—each being a component part of just compensation."

**4.** Russell Means, a Sioux who is acting *pro se,* has requested leave to file petitions, signed by individual Sioux, in opposition to the motion for attorneys' fees. Those Indians oppose the award of any fees, on the ground that they have not authorized suit for the recovery of money, but instead have wanted to seek the return of the Black Hills to the Sioux. Mr. Means, acting *pro se,* has no standing to represent other Sioux. Moreover, the arguments he is attempting to present to us come far too late. *See Western Shoshone Identifiable Group v. United States,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389. Accordingly, Mr. Means is denied leave to file petitions in opposition to the motion for attorneys' fees. For the same reason we decline to consider resolutions by various groups of Sioux opposing the payment of any attorneys' fees, which have been submitted to the clerk of our court.

**5.** The *Confederated Ute* case, *supra,* was brought under a special jurisdictional act that provided for attorneys' fees not to exceed 10 percent. Most of the attorneys' contracts provided for a fee of not more than 10 percent and not less than 7½ percent. The judgments totaled $31,938,473.43, and we awarded attor-

## CONCLUSION

The motion to award attorneys' fees is granted. Arthur Lazarus, Jr., the attorney of record, for his firm and on behalf of all contract attorneys having an interest in the fee, is awarded ten million, five hundred ninety-five thousand, nine hundred forty-three dollars ($10,595,943), to be paid out of the judgment in this case of $105,994,430.52.

neys' fees of $2.8 million, which was 8¾ percent of the award. One of the three grounds upon which we declined to award the attorneys 10 percent of the recovery was that the total award of "almost $32,000,000, is so large that an attorney's fee of ten percent based on that figure shocks us somewhat." 120 Ct.Cl. at 681.

That decision was rendered almost 30 years ago (November 6, 1951). Since that time, both this court and the Indian Claims Commission generally have fixed attorneys' fees at 10 percent of the award. Lower percentages have been awarded only where, because of settlement or stipulation concerning value, less work by the attorneys was required (*Confederated Bands of Ute Indians v. United States*, 120 Ct.Cl. 609 (1951) (8¾%); *Mescalero Apache Tribe v. United States*, 18 Ind.Cl.Comm. 398 (1967) (9.5%); *Indians of California v. United States*, 16 Ind.Cl.Comm. 631 (1966) (9%); *Confederated Bands of Ute Indians v. United States*, 15 Ind.Cl.Comm. 516 (1965) (9.5%); *Southern Paiute Nation v. United States*, 15 Ind.Cl.Comm. 433 (1965) (9%); *Uintah Ute Indians of Utah v. United States*, 9 Ind.Cl.Comm. 74 (1961) (9.5%)) or, in one case, where the quality of the attorneys' services was deemed deficient (*Suquamish Tribe of Indians v. United States*, 34 Ind.Cl.Comm. 358 (1974) (8.77%)). As indicated in the text, we conclude that 10 percent of the total award is an appropriate attorneys' fee in this case. Unlike the situation in *Confederated Ute*, the size of the fee here does not shock us.