**SIOUX NATION OF INDIANS et al.**

v.

**The UNITED STATES.**

No. 148–78.

United States Court of Claims.

June 13, 1979.

Arthur Lazarus, Jr., Washington, D. C., attorney of record, for plaintiff; Marvin J. Sonosky, Sonosky, Chambers & Sachse, and William Howard Payne, Washington, D. C., of counsel.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, DAVIS, NICHOLS, KUNZIG, BENNETT and SMITH, Judges en banc.

## OPINION

FRIEDMAN, Chief Judge.

The issue in this case, here on appeal from the Indian Claims Commission under a special jurisdictional statute described below, is whether the Commission correctly held that an 1877 statute under which the United States acquired certain lands from the Sioux Indians constituted a taking of those lands for which the United States was required to pay just compensation under the fifth amendment. The Commission found the fair market value of the land and other interests in it that the government thus acquired was $17,553,484.[1] The government has not challenged that determination or contested its obligation to pay that amount.

■ The sole question before us is whether that acquisition constituted a taking in violation of the fifth amendment. The significance of that issue is that if it were such a taking, the government would be liable not only for the value of the property taken but also for interest from the date of taking. *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *United States v. Klamath and Moadoc Tribes of Indians*, 304 U.S. 119, 123, 58 S.Ct. 799, 82 L.Ed. 1219 (1938). Because the acquisition in this case occurred a century ago, the amount of such interest would be many times the value of the property taken. The total interest the plaintiffs

would recover if a taking occurred has been estimated at between $90 million and $115 million.

For the reasons given below, we conclude that the 1877 Act was a taking of the Black Hills portion of the Sioux Reservation and of rights-of-way across other Sioux land, but that the United States did not take the gold the miners removed from the Black Hills prior to the 1877 statute.

### I.

This is the third time this case has been before the court on the question whether the United States' acquisition of the particular property in 1877 constituted a taking. Under a special jurisdictional Act, Pub.L. No. 237, 41 Stat. 738 (1920), the Sioux filed in this court a petition seeking just compensation for the alleged taking in 1877 of their lands and rights therein. In 1942 the court held that under that Act the Sioux were "not entitled to recover from the United States as for a 'taking' or 'for the misappropriations of any lands of said tribe.' " *Sioux Tribe of Indians v. United States*, 97 Ct.Cl. 613, 666 (1942), *cert. denied*, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943).

Following the enactment of the Indian Claims Commission Act in 1946 (25 U.S.C. § 70 *et seq.*), the Sioux submitted the same claim to the Commission. Initially the Indians contended only that the government's acquisition of their property was made for an unconscionable consideration and did not constitute fair and honorable dealings—grounds upon which the Commission could award damages under 25 U.S.C. § 70a(3) and (5). The Sioux, with our authorization, amended their petition to reassert the fifth amendment taking. *See Sioux Tribe of Indians v. United States*, 182 Ct.Cl. 912 (1968) (summary of proceedings).

After extensive proceedings, the Indian Claims Commission, in the decision now under review, held in 1974 that the government's acquisition of the Sioux lands and interest therein constituted a taking for

---

1. This amount consisted of $17,100,000 for the land itself, $3,484 for rights-of-way across other Sioux land, and $450,000 for gold that miners took from the land before the 1877 statute.

which the Sioux were entitled to just compensation, including simple interest at 5 percent. *Sioux Nation v. United States,* 33 Ind.Cl.Comm. 151, 362–63 (1974). On appeal, this court affirmed the award of $17,553,484 under the dishonorable dealings provision of the Indian Claims Commission Act, but reversed the Commission's finding of a taking. The court held that its 1942 decision was *res judicata* on the taking question. *United States v. Sioux Nation,* 518 F.2d 1298, 207 Ct.Cl. 234 (1975), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387.

Congress then enacted Pub.L. No. 95–243, 92 Stat. 153 (1978), which directed that this court, upon filing of a timely application, should

> review on the merits, without regard to the defense of res judicata or collateral estoppel, that portion of the determination of the Indian Claims Commission entered February 15, 1974, adjudging that the Act of February 28, 1877 (19 Stat. 254), effected a taking of the Black Hills portion of the Great Sioux Reservation in violation of the fifth amendment, and shall enter judgment accordingly. In conducting such review, the Court shall receive and consider any additional evidence, including oral testimony, that either party may wish to provide on the issue of a fifth amendment taking and shall determine that issue de novo.

The Sioux Nation filed an appropriate application for review pursuant to that statute. Neither party has submitted any additional evidence, so we decide the case on the record in our 1942 case and the record before the Commission in this proceeding.

## II.

The factual background for this issue begins with the Treaty of April 29, 1868 between the United States and the Sioux Indians (15 Stat. 635). In that treaty the United States, among other things, (1) established "for the absolute and undisturbed use and occupation of the Indians" certain land in South Dakota, including more than 7 million acres in the Black Hills area (article II); (2) agreed that no unauthorized persons "shall ever be permitted to pass over, settle upon, or reside in [that] territory" (*id.*); (3) undertook to supply for 4 years certain food to all Indians who settled permanently on the reservation and complied with the treaty (article X); and (4) gave the Indians hunting rights in designated areas outside the reservation (articles XI and XV). The treaty further provided that no cession of any reservation lands of the Sioux "shall be of any validity or force" unless executed and signed by at least three-fourths of the adult male Indians occupying or interested in those lands (article XII).

In accordance with the treaty obligation, the United States appropriated more than $5 million to supply food to the Indians for the 4 years following the treaty. Although the government's treaty obligation was discharged by the appropriation for fiscal year 1874, the government continued to make food appropriations for the fiscal years 1875 and 1876, which totaled $2,350,000.

Both before and when the treaty was executed, the Indians knew that the Black Hills contained gold, but the government had no reason to think that the amount located there was sufficient to be valuable. In the summer of 1874, however, an expedition commanded by Lt. Col. Custer explored the Black Hills portion of the reservation, and discovered gold there in paying quantity. News of this discovery was made public in late August of that year. A large number of prospectors, miners, and settlers then entered the area without the consent of the Indians, and public pressure to open the Black Hills developed and increased.

United States military forces in the area attempted to exclude and remove these unauthorized persons from the area, but their endeavors were largely unsuccessful. In November 1875, President Grant secretly ordered the Army to stop attempting to prevent the miners from entering the area. Although President Grant did not rescind prior orders forbidding the miners from occupying the Black Hills area, those earlier orders ceased to be effective. The govern-

ment apparently believed that the Sioux's needs for the rations the government had been supplying them would prevent the Indians from making trouble.

By 1875 the government apparently had concluded that the only permanent solution to the hostilities that had developed between the Indians and the settlers in the Black Hills and among the settlers themselves was for the government to acquire the Black Hills portion of the reservation and for the Indians to give up their hunting rights outside the reservation. Preliminary attempts to induce the Indians to take those steps through negotiations with the Sioux that were held both in Washington and in the reservation area were unsuccessful. In December 1875, the government ordered all Sioux to return to the reservation by January 31, 1876, or be treated as hostile. The Indians who were outside the reservation were hunting with the permission of their agents and could not return by the deadline. The Army then commenced military operations against them. The climax of the campaign against the Sioux was the famous defeat of General Custer at the Little Big Horn on June 25, 1876.

Congress responded by attaching a rider to the Indian Appropriations Act of 1876 which cut off all rations for the Sioux until they terminated hostilities and ceded the Black Hills to the United States. The rider also provided that no further appropriations for the Sioux would be made until the Indians had entered into an agreement with the President "which is calculated and designed to enable said Indians to become self-supporting." Act of Aug. 15, 1876, 19 Stat. 176, 192.

In August 1876, at the request of Congress, the President appointed another commission (1876 Commission) to negotiate with the Sioux for the cession of the Black Hills and the termination of the Indians' off-reservation hunting rights.

The 1876 Commission negotiated an agreement with the chiefs and head men of the Sioux tribes. The agreement stated it was made "pursuant to" the 1876 Appropriations Act. In the agreement, the Sioux ceded to the United States the Black Hills portion of their reservation and rights-of-way over other reservation lands for access to the Black Hills. In return, the United States agreed (1) "to provide all necessary aid to assist the said Indians in the work of civilization"; (2) to furnish the Indians "schools and instructions in mechanical and agricultural arts, as provided for by the treaty of 1868"; and (3) to provide them with specified rations "until the Indians are able to support themselves." Where government schools were provided, rations would not be issued for children between the ages of 6 and 14 unless they regularly attended school. Rations would be issued to Indians located upon land suitable for cultivation only to those persons (other than the aged, sick, and infirm) "who labor[ed]." See Act of Feb. 28, 1877, 19 Stat. 254, 255–56.

Less than 10 percent of the male Sioux population aged 21 years or older approved the agreement. The agreement, therefore, did not satisfy the requirement of the 1868 treaty that no cession of territory could be made without the written approval of three-fourths of the adult males. Congress then "resolved the impasse by enacting into law the unratified agreement" by the Act of February 28, 1877, 19 Stat. 254. *United States v. Sioux Nation*, 518 F.2d at 1300, 207 Ct.Cl. at 238. As a result of that Act, which "ratified and confirmed" the agreement, the United States acquired all of the Sioux lands in the Black Hills, and terminated the Indians' off-reservation hunting rights.

Subsequent to the Act of 1877, the United States expended substantial amounts in furnishing rations to the Sioux. The parties disagree over the precise amount of those expenditures. According to the defendant the United States spent approximately $43 million on rations for the Sioux from 1877 to 1942. *See Sioux Tribe of Indians v. United States*, 97 Ct.Cl. at 656, 662.

### III.

■ A. Ordinarily, when the United States appropriates property interests of

others, that constitutes a taking under the fifth amendment, for which the United States is obligated to pay just compensation. But,

[w]hen Congress deals with the Indian property it can act in one of two capacities. First, Congress can exercise a guardianship over Indian property, derived from its plenary power recognized in the Constitution to control tribal Indian affairs. Or it may exercise its fundamental power of eminent domain and take Indian property, for which it must pay just compensation.

*Klamath and Modoc Tribes v. United States*, 436 F.2d 1008, 1015, 193 Ct.Cl. 670, 684–85 (1971) (footnote omitted).

In *Three Affiliated Tribes of Fort Berthold Reservation v. United States*, 390 F.2d 686, 182 Ct.Cl. 543 (1968), the court announced the following "guideline" for "identify[ing] in which capacity Congress is acting":

Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee.

390 F.2d at 691, 182 Ct.Cl. at 553.

The court reiterated and applied that standard in subsequent cases presenting the question whether Congress' appropriation of Indian property constituted a taking. *Klamath and Modoc Tribes v. United States*, 436 F.2d at 1015, 193 Ct.Cl. at 685; *Confederated Salish & Kootenai Tribes v. United States*, 437 F.2d 458, 459, 193 Ct.Cl. 801, 805 (1971).

■ Apparently there has been some misconception that the "good faith effort" guideline in *Fort Berthold* requires or permits an inquiry into the subjective understanding and intent of Congress. See order of March 29, 1974, in Appeal No. 17–72, *The Three Affiliated Tribes of the Fort Berthold Reservation, et al.*, Nichols, J., concur-

ring, 204 Ct.Cl. 831, 833. The *Fort Berthold* guideline contemplated only an objective inquiry into the nature and purpose of the congressional action, not an attempt to determine the subjective motive of the legislature in taking that action. In determining whether Congress has made a good faith effort to give the Indians the full value of their lands when the government acquired it, we therefore look to the objective facts as revealed by Acts of Congress, congressional committee reports, statements submitted to Congress by government officials, reports of special commissions appointed by Congress to treat with the Indians, and similar evidence relating to the acquisition. As hereinafter shown, this is the kind of evidence upon which we have relied in reaching our conclusion in this case.

■ The "good faith effort" and "transmutation of property" concepts referred to in *Fort Berthold* are opposite sides of the same coin. They reflect the traditional rule that a trustee may change the form of trust assets as long as he fairly (or in good faith) attempts to provide his ward with property of equivalent value. If he does that, he cannot be faulted if hindsight should demonstrate a lack of precise equivalence. On the other hand, if a trustee (or the government in its dealings with the Indians) does not attempt to give the ward the fair equivalent of what he acquires from him, the trustee to that extent has taken rather than transmuted the property of the ward. In other words, an essential element of the inquiry under the *Fort Berthold* guideline is determining the adequacy of the consideration the government gave for the Indian lands it acquired. That inquiry cannot be avoided by the government's simple assertion that it acted in good faith in its dealings with the Indians.

The question in this case, therefore, is whether, in appropriating the Black Hills portion of the Sioux Reservation in the Act of 1877, Congress made "a good faith effort to give the Indians the full value of the land." 390 F.2d at 691, 182 Ct.Cl. at 553.[2]

---

2. In *Klamath and Modoc Tribes v. United States*, the court noted that the government

had not contested that certain Indian lands had been "taken, in the strict eminent-domain

The defendant asserts that in this case a good faith effort is shown (1) in the government's undertaking to provide rations for the Sioux "until the Indians are able to support themselves" and (2) in its subsequent expenditure of at least $43 million on such food. According to the government, the assumption of this substantial financial obligation and its discharge at great ex-

pense gave the Sioux the full value of the land the government took from them, so that the appropriation did not constitute a fifth amendment taking.[3]

■ The answer to the question requires a more detailed examination of the circumstances surrounding the action of Congress in appropriating the Sioux land in 1877.[4]

sense" when they were transferred to the government in 1961 pursuant to an earlier statute terminating federal control over the Indians. 436 F.2d 1008, 1017, 193 Ct.Cl. 670, 689 (1971). In a footnote to that statement the court stated, "The concession by the Government that there was a taking is quite correct . . . . The 'good faith' principle of *Fort Berthold* does not apply to acquisition of Indian land by the Federal Government itself." *Id.* n. 25. The plaintiff argues that under that qualification there is no need here to consider "good faith," since the fact that the United States acquired the Black Hills for its own use without more established a taking.

As noted in the text, the rationale of the "good faith" principle is that there is no taking of Indian property if Congress "has made a good faith effort to realize its full value for the Indians, . . . [where] it has in effect performed the trustee's traditional function of transmuting property into money." *Id.* 436 F.2d at 1015, 193 Ct.Cl. at 685. Thus, "Congress makes a good faith effort to obtain full value for Indian land, to be sold to others, when it establishes and uses an adequate, competent and impartial appraisal system to value the property." *Id.* 436 F.2d at 1016, 193 Ct.Cl. at 687. Conversely, there is no occasion to consider "good faith" where the United States appropriates Indian lands for itself without attempting to give the Indians the fair equivalent of what it acquires. Where, however, the government contends that it has not taken Indian land in the eminent-domain sense because, although it acquired the land for itself, it nevertheless gave the Indians the fair value of the property, the taking *vel non* depends upon whether the government meets the "good faith" standard of *Three Affiliated Tribes of Fort Berthold Reservation v. United States,* 390 F.2d 686, 182 Ct.Cl. 543 (1968). Moreover, in this case the lands were taken for ultimate disposition to settlers rather than, as in *Klamath and Modoc,* for the government's own continued use.

3. The 1877 Act effected the appropriation of the Black Hills by redefining the boundaries of the Sioux Reservation. That redefinition gave the Indians approximately 900,000 acres of land they had not theretofore had. The defendant does not contend, however, that the transfer of this additional land was a significant

element of the consideration the United States gave for the Black Hills.

4. In 1974 Congress amended section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a, to provide that "expenditures for food, rations, or provisions shall not be deemed payments on the claim." Pub.L. No. 93–494, 88 Stat. 1499, 1500 (1974). The plaintiff argues that the 1974 amendment requires this court to decide the taking claim without regard to either the provision for food rations in the 1877 treaty or the value of the rations actually provided. According to the plaintiff, the 1974 amendment established the general rule that provisions for Indian subsistence cannot be considered compensation.

The legislative history of the 1974 amendment indicates that the amendment was intended to apply to the calculation of offsets following an award, and not to the initial determination whether the plaintiff is entitled to recover an award in a fifth amendment taking claim. The Senate Report on the 1974 amendment states that the amendment was "designed to correct an inequity in connection with the claim of the Sioux tribes of North and South Dakota." S.Rep. No. 93–863, 93d Cong., 2d Sess. 2, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6111, 6112. The report quoted approvingly a statement provided by the Sioux Tribes that "[a]lthough couched in general terms, this amendment is directed to . . . expediting . . . disposition of the famous Black Hills case . . . ." *Id.*

During the House Subcommittee on Indian Affairs' hearing on the amendment, Representative Meeds, chairman of the subcommittee, stated:

In February of this year, the Indians Claims Commission determined that the United States had, in violation of the fifth amendment to the Constitution, unilaterally taken over 7 million acres of Sioux land which they determined had an 1877 value of $17,100,000. In addition to the value of certain gold taken from the hills area between 1868 and 1877, the total value was set at $17,550,000 upon which the United States was required to pay 5 percent simple interest from the time of taking.

Under the provisions of the Claims Commission Act, the Commission determined that

B. In June 1875, more than 9 months after the Custer expedition had discovered gold in paying quantities in the Black Hills, a delegation of Sioux Indians met with the President in Washington for a preliminary discussion of the cession by the Indians of the Black Hills and their off-reservation hunting rights. The President pointed out to the Sioux that "there will be trouble in keeping white people from going there for gold, if it should be discovered . . . it is possible that strong efforts might not be made to keep them out." The President also told the Sioux that if the United States should purchase the Black Hills, "I would try to see you get a full equivalent in value" and that he was "very anxious that the Government of the United States should pay them in a way that will be of most benefit to them, a full equivalent for all that they have given up . . . ." *Sioux Tribe of Indians v. United States,* 97 Ct.Cl. at 630–32.

In September 1875, the Allison Commission, which the Secretary of the Interior had appointed upon instructions from President Grant to negotiate with the Sioux for the cession of the Black Hills and the surrender of hunting rights, met with the Indians on the reservation in a Grand Council. The commission urged the Indians to sell the Black Hills

> because 1—they were unable to support themselves and ought to bow to the wishes of the Government which fed them, 2—the Army was unable to keep settlers out of the hills and armed conflict

between whites and Indians was inevitable, and 3—gold was useless to the Sioux. *Sioux Nation v. United States,* 33 Ind.Cl. Comm. at 252, finding 5. The Sioux offered to sell the Black Hills for $70 million. The commission offered $6 million, or alternatively, $400,000 a year for the right to mine, grow livestock and cultivate the soil in the Black Hills, and $500,000 (paid over 10 years) for the surrender of the Sioux's off-reservation hunting rights. No agreement was reached.

In its report on the unratified 1876 agreement that Congress adopted in the 1877 statute, the 1876 Commission stated that the Allison Commission had failed to obtain an agreement "because they had no authority to offer them [the Indians] any sum which would be a just equivalent for their right in the Black Hills, or which gave to the Indians hopes for the future." S.Exec. Doc. No. 9, 44th Cong., 2d Sess. 12 (1876).

Following the failure of the 1875 negotiations, the government changed its prior policy of using the Army to exclude miners and settlers from the Black Hills (see p. 5 *supra*). In November 1875 the Army began to withdraw from the area.

In his annual report to Congress for 1875, the Secretary of the Interior, after noting the failure of the Allison Commission to negotiate an agreement, pointed out that for 2 years the United States had appropriated more than a million dollars annually for the subsistence of the Sioux. He stated that this was "a gratuity that the Govern-

---

the United States could offset food, rations, and other provisions supplied to the Sioux under the 1877 agreement. If so applied, they would almost totally, or totally wipe out any award the Sioux would try to recover.

It is from this result that the Sioux appeal, and the subject, this bill would remedy.

*Amending the Indian Claims Commission Act: Hearing on H.R. 16170 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs,* 93d Cong., 2d Sess. 4 (1974) (remarks of Representative Meeds).

Underlying the House Subcommittee hearing was a deep concern for the fate of the Commission's $17 million award to the Sioux Indians. The subcommittee focused upon the question whether the value of the rations provided to the

Sioux should be offset against the Commission's award with the resulting substantial diminution or possible elimination of the award. There is no indication that, in providing that expenditures for rations were not to be deemed "payments on the claim," Congress intended to bar consideration of a government commitment to provide subsistence in determining whether the government's appropriation of the Sioux's Black Hills lands in 1877 constituted a fifth amendment taking.

The location of the amendment in the paragraph of section 70a dealing with "determining the *quantum* of relief" (emphasis supplied) further supports our conclusion. The determination whether there has been a taking normally involves the question of liability rather than the quantum of damages.

ment is under no obligations to give them, and for which it receives no compensating advantage." *Sioux Tribe of Indians v. United States,* 97 Ct.Cl. at 647. He suggested that Congress consider "whether it would not be justifiable and proper to make future appropriations for supplies to this people, contingent on the relinquishment of the gold fields in the Black Hills and the right-of-way thereto." *Id.*

As noted, the acquisition of the Black Hills was made by the Act of 1877. In that Act Congress adopted the unratified agreement which the 1876 Commission had negotiated with the Sioux chiefs and head men. Since it was the rider to the Appropriations Act of 1876 that provided for the appointment of the 1876 Commission and defined its authority in negotiating with the Sioux, the legislative history of that Act is highly significant in ascertaining the intention and theory of Congress in acquiring that land.

The antecedent of the 1876 Appropriations Act was S. 590, 44th Cong., 1st Sess., which was a bill "providing for an agreement with the Sioux Nation in regard to a portion of their reservation and for other purposes." 4 Cong.Rec. 1662 (1876). As reported by the Committee on Indian Affairs on March 15, 1876, the bill provided for a commission to negotiate with the Sioux for cession of the Black Hills, in return for which the United States would provide the Indians with subsistence for not more than 10 years. The bill further provided that subsistence would be terminated on July 1, 1877 (more than a year later) unless by then the Sioux had agreed to cede the Black Hills. After extensive debate (*id.* at 1796–1801, 1829–30, 2177, 3530–39), the bill was amended to eliminate the provision for termination of subsistence; it provided for a commission to negotiate with the Sioux "for the cession to the United States" of parts of the reservation and adjacent territory "or otherwise for the preservation of peace." *Id.* at 3539. The Senate passed it in that form.

In the House, S. 590 was reported with an amendment which permitted the proposed commission to negotiate for the acquisition of the Black Hills (*id.* at 3817), but the bill was recommitted and died in committee (*id.* at 4470, 4520). The House then passed H.R. 3478, the Appropriations Bill for the Indian Department, which stated that no portion of the appropriation of $1 million for feeding the Sioux would be available unless the Indians first agreed to abandon all claims to lands outside the reservation. *Id.* at 3498, 3503–08, 3639.

The Senate modified H.R. 3478 to provide that one-half of the appropriation for Sioux subsistence would be suspended until the Indians agreed to cede the Black Hills and to relinquish their off-reservation hunting rights. *Id.* at 3902. The House refused to accede to this change (*id.* at 4043), and successive conference committees were appointed. *Id.* at 4043, 4057, 4324, 4563, 5463, 5539.

On June 25, 1876, General Custer was defeated at Little Big Horn. Less than 2 months later, on August 15, 1876, Congress enacted the 1876 Appropriations Act, with its rider (1) cutting off rations for the Sioux unless they terminated hostilities and ceded the Black Hills, and (2) providing for a commission to carry those provisions into effect.

Pursuant to this provision, the President appointed the 1876 Commission that negotiated with the Sioux the unratified agreement ceding the Black Hills. In transmitting the report of the commission to the Secretary of the Interior, the Commissioner of Indian Affairs described the commission as one "to obtain certain concessions from the Sioux, in accordance with provision contained in the Indian appropriation act for the current fiscal year." S.Exec.Doc. No. 9 at 2. In transmitting that report to the Congress, President Grant used almost identical language in describing the commission. *Id.* at 1.

The instructions to the commission, referring to the rider to the Appropriations Act, stated that "the Indians should be made to understand distinctly that they can hope for continued appropriations only by full submission to the authority and wishes of the Government and upon full evidence of their

disposition to undertake in earnest measures for their own advancement and support." *Id.* at 4. In its meeting with the Sioux the 1876 Commission "submitted to the Indians the conditions required by Congress, and stated that we had no authority to change them in any particular." S.Exec. Doc. No. 9 at 6. The Indians were left with no doubt that if they refused to cede the Black Hills they would receive no further rations from the government. Since the Army had taken from the Sioux their weapons and horses, the alternative to capitulation to the government's demands was starvation, because the Indians no longer had the weapons for hunting, and as hunters they did not know how to farm and raise their own food.

The "consideration" stated in the 1876 agreement for the Sioux's "cession of territory and rights" and "compliance with each and every obligation assumed by the said Indians" was that the United States agreed: (1) to provide the Sioux with "all necessary aid to assist the said Indians in the work of civilization," (2) to furnish to them "schools and instructions in mechanical and agricultural arts, as provided for by the treaty of 1868," and (3) to supply them with specified rations "until the Indians are able to support themselves." *See* 19 Stat. 254, 256. The first item of consideration—the provision of "all necessary aid" to assist the Sioux in becoming civilized—entailed no specific benefits or obligations and was so vague that it cannot be considered as constituting a meaningful or significant element of payment by the United States. In the second item the government merely undertook to perform its obligations under the 1868 treaty; this provision gave the Sioux nothing to which they were not already entitled.

The only item of "consideration" that possibly could be viewed as showing an attempt by Congress to give the Sioux the "full value" of the land the government took from them was the requirement to furnish them with rations until they became self-sufficient. Indeed, this is the only "payment" upon which the defendant significantly relies to show that there was no fifth amendment taking.

After the commission returned to Washington with the executed but unapproved agreement, it submitted in December 1876 a lengthy report describing its negotiations with the Sioux. Sen.Exec.Doc. No. 9 at 5–90. President Grant transmitted the report to Congress. *Id.* at 1. The report stated that the commission had "accepted the trust confided to them under the grave responsibility that if they failed in their mission the twenty thousand friendly Indians at the agencies must either starve or join the hostile Indians." *Id.* at 6. The report described at length the many separate discussions the commission held with the various Indian groups (*id.* at 29–86) and sharply criticized the government's policy toward, and treatment of, the Sioux. *Id.* at 9–18. The report stated that "The least we can do is to repay these friendly Indians honestly for the full value of the property which was taken" (*id.* at 16) and that the commission was "confident that this agreement contains provisions which, if faithfully carried out, will save these Indians and redress some of the wrongs which furnish the darkest page of our history." *Id.* at 17–18. The report also noted that, at the first meeting with the Indians, the commission told them that it had full authority from Congress and the President "to devise a plan to save their people from death and lead them to civilization," and it described the first element of the plan as "to provide ample rations for their subsistence until able to support themselves . . . ." *Id.* at 6.

Nowhere in the report, however, does the commission indicate that it believed the provisions for rations constituted a fair equivalent for the value of the Black Hills lands the Indians were surrendering.

On June 26, 1877, the Senate Committee on Indian Affairs reported a bill to "ratify and confirm" the agreement. 5 Cong.Rec. 983 (1877). The Senate passed the bill the next day. The debate in that chamber dealt almost entirely with the possible movement of the Sioux from their reserva-

tion to Indian territory (*id.* at 1055–58)—a provision which was included in the agreement although agreed to by only two of the bands and which the Senate committee deleted. *Id.* at 1055. The sole reference to the Black Hills was Senator Allison's statement that

> [i]t is an imperative necessity that so much of this agreement as provides for the relinquishment of that vast area of territory which lies west of this boundary should be at once placed in the possession and under the control of the Government of the United States, and that can only be done by giving the force and effect of our sanction to this bill.

*Id.* at 1057.

The House passed the bill almost 3 weeks later on February 15, 1877. *Id.* at 1617. There, as in the Senate, the debate dealt almost entirely with the possible removal of the Sioux to Indian territory. *Id.* at 1615–17. Representative Boone described the bill as one of "great importance" that should be passed. He explained:

> The Black Hills country is to the people of the United States a valuable country. This agreement concedes the Black Hills territory to the Government of the United States, in consideration of which we make provision for feeding these Indians upon the Missouri River at points contiguous to the means of transportation, so that there will be a saving to the Government in feeding the Indians, in addition to the transfer of this valuable country to the United States.
>
> Besides this, the Indians by this bill are to be placed on a part of the reservation which they now hold which is susceptible of cultivation; and if we are ever to succeed in teaching them the arts of agriculture and civilization they will be in a position where we can carry forward those great enterprises which have succeeded so well in the Indian Territory with much greater facility than can possibly be done in the present scattered and inaccessible condition of these Indians.

*Id.* at 1615.

Similarly, Representative Crounse stated: "It is of the greatest importance that this

bill pass and that the Black Hills country be opened up at once." *Id.* at 1616.

The lack of any discussion of whether the "consideration" provided by the United States was adequate consideration for the lands surrendered may have reflected the belief which Senator Allison stated, that the agreement "has already been agreed to by all these bands." *Id.* at 1056. Senator Allison did not note that the cession of the Black Hills was not approved by three-quarters of the adult male Indians, as the 1868 treaty required.

■ C. The foregoing history of congressional consideration of obtaining the Black Hills and of the negotiations with the Sioux about the cession of those lands demonstrates that in the Act of 1877 Congress did not make "a good faith effort to give the Indians the full value of the land." *Fort Berthold Reservation v. United States*, 390 F.2d at 691, 182 Ct.Cl. at 553. The terms upon which Congress acquired the Black Hills were not the product of any meaningful negotiation or arm's-length bargaining, and did not reflect or show any considered judgment by Congress that it was paying a fair price. In the "negotiations" the United States gave the Indians the Hobson's choice of ceding the Black Hills or starving. Not surprisingly, the Sioux chiefs and head men chose the former rather than the latter.

The earlier attempt by the Allison Commission to negotiate an agreement for the sale of the Black Hills foundered because of the gross disparity between the $70 million the Indians asked and the $6 million the government offered. Since the treaty of 1868 had given the Sioux "the absolute and undisturbed use and occupancy" of the Black Hills, the Indians were under no legal compulsion to sell. They were induced to yield these valuable lands to the government because of the threatened cutoff of their rations, which were essential to their existence.

When the agreement for cession of the Black Hills failed to gain the written ap-

proval of three-quarters of the adult male Sioux as the 1868 treaty required for a cession to have "any validity or force," Congress merely "ratified and confirmed" the unapproved agreement and thereby acquired the Black Hills.[5] There is no indication that Congress believed that, or even considered whether, the obligation it assumed to furnish the Sioux with rations until they could support themselves, constituted the fair equivalent of the value of the lands the United States was acquiring from them.

In return for obtaining the Black Hills, the government did not even unqualifiedly undertake to provide all the Sioux with food. The right of the Indians to receive rations was qualified by the provisions that rations would be furnished for children between the ages of 6 and 14 only if they attended government schools, and for non-infirm Indians located upon land suitable for cultivation only if they performed "labor." Indians who did not meet these conditions would receive no food, irrespective of any rights they may have had with respect to the property the United States acquired. These conditions further show that the government's undertaking to furnish rations to the Indians until they could support themselves did not reflect a congressional decision that the value of the rations was the equivalent of the land the Indians were giving up, but instead was an attempt to coerce the Sioux into capitulating to congressional demands.

In the 2 years following termination of its obligation under the treaty of 1868 to furnish rations for 4 years, the government gratuitously had appropriated $2,350,000 to feed the Sioux. In the 1876 Appropriations Act Congress appropriated $1 million for "subsistence" for the Sioux and "for purpose of their civilization." The bill (S. 590 *supra*, p. 12) from which the cutoff rider to the 1876 Appropriations Act was derived, provided that if the Sioux ceded the Black Hills, the United States would furnish sub-

sistence to the tribe "from year to year *for a period not exceeding ten years . . .* in such manner as Congress may by law provide" (emphasis provided).

Congress hoped and anticipated that in a relatively short time the Sioux would learn the ways of civilized society and become self-sufficient. In the treaty of 1868 the United States had undertaken to do various things which it hoped would accomplish those objectives, such as building schools, giving instruction in farming, providing blacksmiths, etc. 15 Stat. 635, 637–38. There is no reason to believe that Congress anticipated (1) that it would be required to continue to supply rations for more than a half-century, or (2) that its fulfillment of the obligation to feed the Sioux would entail the large expenditures it ultimately made.

■ The fact that over the years Congress may have spent substantially more in furnishing rations than the fair market value of the Black Hills in 1877 does not establish that when Congress undertook to supply the rations it "was attempting to give the Indians the full value of the land." *Fort Berthold Reservation v. United States*, 390 F.2d at 692, 182 Ct.Cl. at 555. The critical inquiry is what Congress did—and how it viewed the obligation it was assuming—at the time it acquired the land, and not how much it ultimately cost the United States to fulfill the obligation. If the legislative action when taken did not reflect "the exercise by Congress of its plenary authority to manage the property of its Indian wards for their benefit" (*id.* 390 F.2d at 693, 182 Ct.Cl. at 557), the subsequent payment to those wards of amounts that in hindsight appear to equal or even exceed the fair value of the property does not make the initial acquisition any the less a fifth amendment taking. As this court stated in the *Fort Berthold* opinion, where the government argued that its acquisition of certain Indian lands in 1917 by Presiden-

---

**5.** The only significant change the 1877 Act made in the agreement was the elimination of the provision, which the Indians considered particularly objectionable, that the Sioux would move from their reservation to other lands the United States would provide in Indian territory. That change did not alter or affect the consideration the United States gave for the Black Hills.

tial proclamation was not a taking because the government paid an adequate amount for the lands in 1920, "[a] unilateral appropriation of money several years later does not affect the character of the original taking." *Id.* 390 F.2d at 698, 182 Ct.Cl. at 564.

D. The defendant argues, however, that *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), controls this case and establishes that the acquisition of the Black Hills by the 1877 Act did not constitute a taking.

The underlying facts in that case were somewhat similar to those here, but the legal issue was quite different. An 1867 treaty with certain Indian tribes established a reservation for them and provided that no treaty for the cession of reservation lands would be "of any validity or force" unless executed and signed by three-quarters of the adult males. In 1892 the Indians agreed to cede the reservation to the United States, in return for allotments out of those lands and the payment to and setting aside for the Indians of $2 million. Although it appeared that the requisite three-quarters of the Indians had signed the agreement, it subsequently developed that the requisite number had not signed. In 1900 Congress enacted a statute which in effect adopted the 1892 agreement. The Indians then filed a bill in equity to enjoin the government from carrying out the statute which, they asserted, violated the 1867 treaty requirement of consent by three-quarters of the adult male Indians.

The Supreme Court upheld the lower courts' dismissal of the suit. It ruled that the plenary power of Congress "to administer the property of the Indians" authorized it "to abrogate the provisions of an Indian treaty" (*id.* at 565, 566, 23 S.Ct. at 221); that the power "has always been deemed a political one, not subject to be controlled by the judicial department of the government" (*id.* at 565, 23 S.Ct. at 221); that the 1900 statute "purported to give an adequate consideration for the surplus lands not allotted among the Indians or reserved for their benefit" (*id.* at 568, 23 S.Ct. at 222); that the Court "must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises" (*id.*); and that "[i]n any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained" (*id.*).

In the *Lone Wolf* case, the Supreme Court was not required to, and did not, decide the legal issue whether, as a result of the 1900 statute, the Indians were entitled to recover just compensation for a fifth amendment taking. The claim made by the Indians was that, if the statute were enforced, their rights under the Treaty would be violated and Congress "would deprive said Indians of their lands without due process of law." 187 U.S. at 561, 23 S.Ct. at 219. By proceeding in equity, the Indians necessarily raised the threshold issue whether the governmental action in question could or should be enjoined. The Court concluded that Congress had the power to proceed with its plan for appropriation of Indian lands, and that it was not within the province of the judiciary to stay the hand of Congress. The Indians recognized that they had no remedy at law, and the Court ruled that they were not entitled to equitable relief. Under the circumstances, the Court inescapably concluded that, if Congress caused some injury by the exercise of its power, "relief must be sought by an appeal to that body" and not through the judicial process. 187 U.S. at 568, 23 S.Ct. at 222.[6]

---

**6.** In the *Lone Wolf* case, the bill of complaint before the lower court recited that the plaintiff and other tribal members were "wholly without remedy at law," and stated that they would

There is broad language in the *Lone Wolf* opinion that could be read as suggesting that the courts will not inquire into the propriety of congressional action concerning Indian property or consider the adequacy of the consideration Congress gave for the lands it appropriated from the Indians. The Supreme Court, however, frequently has cautioned against uncritically applying language used in a particular context in dealing with different situations. *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) ("words of our opinions are to be read in the light of the facts of the case under discussion. . . General expressions transposed to other facts are often misleading."); *White v. Aronson*, 302 U.S. 16, 21, 58 S.Ct. 95, 82 L.Ed. 20 (1937); *Puerto Rico v. Shell Co.*, 302 U.S. 253, 269, 58 S.Ct. 167, 82 L.Ed. 235 (1937); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821).

The statements in *Lone Wolf* upon which the defendant relies were all made in determining whether courts should enjoin the enforcement of a statute which, by appropriating Indian property, was inconsistent with an Indian treaty. The question in this case, however, is a quite different one: whether a statute by which Congress appropriated Indian lands constituted a fifth amendment taking for which the United States is required to pay just compensation.

 Since *Lone Wolf*, in which no consent had been given to sue the United States for just compensation, the Supreme Court has recognized that if the United States takes Indian property for its own use or to give to others, it must pay just compensation. This has been done where no compensation was originally paid and where the initial compensation was grossly inadequate.[7] These are cases in which consent to sue for such compensation was authorized by special jurisdictional acts and include *United States v. Creek Nation*, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935), and *United States v. Klamath and Moadoc Tribes*, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938). A significant element of the *Lone Wolf* decision apparently was the principle that the courts would not examine the consideration that Congress had given for Indian lands it had taken. However, we think the entitlement of plaintiffs to recover in this case should be determined in accordance with the principles laid down in post-*Lone Wolf* decisions, in which the consideration paid the Indians is taken into account in determining whether just compensation has been given. 304 U.S. at 125, 58 S.Ct. 799. *See also, United States v. Sioux Nation*, 518 F.2d at 1307, 207 Ct.Cl. at 250 (dissenting opinion of Davis, J.).

## IV.

The Indian Claims Commission also held that the acquisition by the United States in the 1877 Act of rights-of-way across other Sioux lands constituted a taking for which the Indians are entitled to just compensation. It valued those rights-of-way at $3,484. The defendant concedes that the rights-of-way claims "Fall Into The Same Category As The Black Hills Transfer." Defendant's Answering Brief at 118. In

suffer great property loss if the court were to deny injunctive relief. Supreme Court Record on Appeal No. 275 (October Term, 1902) at 15. In their appeal of the lower court's denial of equitable relief, the appellants argued before the Court that several acts remained to be done before the challenged statute would be fully implemented. Reply Brief of Appellants at 2. Thus, in asserting that "[t]he property of Appellants cannot be taken from them for public use without just compensation," the appellants were arguing that the Court should prevent actions which, appellants believed, would result in an unconstitutional taking *if* not promptly enjoined. Brief and Argument of Appellants at 37. As a result of its determination that

equitable relief was not available, the Court did not have to reach the ultimate, legal question of entitlement to just compensation.

7. In *United States v. Klamath and Moadoc Tribes of Indians*, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938), the United States paid $108,-750 in related parts of a single transaction (*see Klamath and Moadoc Tribes v. United States*, 85 Ct.Cl. 451, 457–58 (1937)) for Indian land which this court later found to have been worth $2,980,000. The Supreme Court held that there was a constitutional taking for which just compensation had to be paid, including interest. 304 U.S. at 122, 123–25, 58 S.Ct. 799.

view of our ruling that the government's acquisition of the Black Hills constituted a taking, we also affirm the Commission's ruling that the government's acquisition of the rights-of-way was a taking for which just compensation must be paid.

## V.

Prior to the 1877 Act, miners had entered the Black Hills area and removed from it gold which the Commission valued at $450,000. The Commission held that this removal of gold was a taking by the United States. It noted the provision in the 1868 treaty by which the United States agreed that unauthorized persons would not be permitted to enter the reservation. The Commission held that the act of taking was the order of President Grant that "the Army withdraw from the Black Hills and stop interfering with miners attempting to enter therein" (33 Ind.Cl.Comm. at 224), and that the date of taking was November 17, 1875, when the Army began to withdraw from the Black Hills. *Id.* at 227. The Commission's rationale was that the removal of the gold from the Sioux reservation was the "direct and natural consequence of President Grant's order" (*id.* at 227) and that "[t]o constitute a taking, it is only necessary that the claimant's loss of its property be the natural and probable consequence of an intentional governmental act" (*id.* at 225).

In its previous decision in this case, the court recognized that the Commission's award of $450,000 for the gold was sustainable under the "fair and honorable dealings" section of the Indian Claims Commission Act, 25 U.S.C. § 70a(5) (*United States v. Sioux Nation*, 518 F.2d at 1301, 207 Ct.Cl. at 240–41), and the government has not challenged that award. *Cf. Temoak Band of Western Shoshone Indians v. United States*, 593 F.2d 994, 1979; *United States v. Goshute Tribe*, 206 Ct.Cl. 401, 512 F.2d 1398 (1975). It is quite another matter, however, to conclude that the action of the miners in illegally removing gold from the Indians' land constituted a taking of that gold by the United States for which just compensation must be paid. We reverse the Commission's ruling on this issue.

The plaintiff contends that the Act of 1877 constituted congressional ratification of President Grant's order terminating the Army's efforts to keep the miners out—an order the effect of which was to permit the miners to remove gold from the Black Hills. Although the statute ratified the agreement the commission had entered into with the chiefs and head men of the Sioux for the cession of the Black Hills, Congress neither ratified nor approved the removal of the gold by the trespassing miners. To the contrary, during congressional consideration of the 1876 Appropriations Act ration cutoff rider, Senators repeatedly condemned the illegal acts of the miners and criticized the government for not having prevented them. 4 Cong.Rec. 1796 (Senator Bogy), 1797 (Senator Hamilton), 1798 (Senator Allison, Senator Edmunds), 1799 (Senator Edmunds), 3531 (Senator Edmunds), 3534 (Senator Bogy), 3949 (Senator Morton). Nothing in either that legislation or the 1877 Act indicates or even suggests that Congress was approving the removal of the gold or the actions of the executive branch that facilitated the removal, or itself was attempting to gain the benefits thereof. Indeed, there is no indication that in 1876 or 1877 Congress was even aware either of President Grant's order or of the commencement of the withdrawal of the Army from the Black Hills in November 1875.

This case is unlike *Shoshone Tribe v. United States, supra,* upon which the plaintiff heavily relies. There the government in 1868 had established a reservation for the "absolute and undisturbed use and occupation of the Shoshone Indians" and provided that no person should ever be permitted to settle or reside in that territory. 299 U.S. at 485–86, 57 S.Ct. 244. Ten years later a band of Northern Arapahoes was brought to the reservation under military escort and settled there. Although the Shoshones were informed that the Arapahoes were there only temporarily, the Indian Commissioner responsible for the arrival had other views. The Arapahoes gradually took over an ever-increasing portion of the reserva-

tion so that ultimately they had the entire eastern section. In subsequent legislation Congress treated "the two tribes as lawful occupants and equals." *Id.* at 490, 57 S.Ct. at 248.

The Supreme Court held that the United States had taken the Shoshone land in 1878. It stated

that from the outset the occupancy of the reservation was intended to be permanent; that, however tortious in its origin, it has been permanent in fact; and that the Government of the United States, through the action and inaction of its executive and legislative departments for half a century of time, has ratified the wrong, adopting the *de facto* appropriation by relation as of the date of its beginning.

*Id.* at 495, 57 S.Ct. at 250–251.

In the *Shoshone* case the government itself placed the Arapahoes on the Shoshones' land, encouraged and aided them to remain there and then recognized and treated them as the owners. The government thus gave the Shoshones' tribal lands to others, and that constituted a taking for which just compensation was required. *Id.* at 497–98, 57 S.Ct. 244; *United States v. Creek Nation*, 295 U.S. at 110, 55 S.Ct. 681. In the present case, by contrast, the government neither brought the miners onto the Black Hills land nor encouraged them to settle there. On the contrary, the government originally attempted to exclude them, and Congress repeatedly criticized the miners' trespassing onto the land.

The plaintiff's claim that the removal of the gold was a taking rests upon the government's failure to keep the miners out and the alleged congressional ratification of that action. As we have already noted, there is no showing of congressional ratification or approval. The extent and significance of the government's involvement in the miners' removal of the gold is a matter of degree, and its involvement here was significantly less than in the *Shoshone* case. We cannot say that what the government did or failed to do with respect to the removal of gold constituted a taking for

which the government was required to pay just compensation.

## VI.

We understand that the award in this case is the largest the Indian Claims Commission ever made. Congress however, was aware of the size of the recovery that would result if the court held that the appropriation of the Black Hills by the 1877 Act constituted a taking. In the section of the House Report on the special jurisdictional statute under which we have heard this case dealing with the potential cost of the legislation, the committee stated that if "the court determines in favor of the claimants," the United States would be liable for interest totalling approximately $85 million. H.R.Rep. No. 95–529, 95th Cong., 2d Sess. 6, *reprinted in* U.S.Code Cong. & Admin. News, pp. 767, 772 (Apr. 1978). Similarly, during debate on the legislation, Representative Udall referred to the estimated cost of $85 million if the Sioux were to prevail. 124 Cong.Rec. H900 (daily ed. Feb. 9, 1978) (remarks of Representative Udall).

Congress concluded that, despite the substantial amount the government would be required to pay if the Indians should prevail on the merits of their taking claim, the Indians should receive from this court a *de novo* determination of the merits of that question. Pursuant to that direction we have decided the case. In so doing, we have carried out the obligation Congress imposed upon us in the 1978 jurisdictional statute.

## CONCLUSION

The order of the Indian Claims Commission of February 15, 1974 (1) is affirmed insofar as it held that the Act of February 28, 1877 constituted a taking of (a) the Sioux land in the Black Hills and (b) the rights-of-way acquired thereunder, but (2) is reversed insofar as it held that the removal of gold from the Great Sioux Reservation prior to February 28, 1877 constituted a taking.

NICHOLS, Judge, concurring:

I concur in the result and in all of the court's opinion except part III D, which discusses *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). With all respect, that part mistakes the holding in *Lone Wolf* and ignores a fundamental proposition in the law of eminent domain. I agree that defendant's reliance on *Lone Wolf* is also mistaken and that it does not establish that the acquisition of the Black Hills by the 1877 Act did not constitute a taking. But the reasons why this is so are quite other than those the court states.

*Lone Wolf* is of vital importance in respect to the claim before us. It was cited, and as this court then thought, faithfully followed in *Sioux Tribe of Indians v. United States*, 97 Ct.Cl. 613, 670 (1942), *cert. denied*, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943), where the discussion of it covers most of four pages. In *United States v. Sioux Nation*, 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), defendant relied on the earlier decision as res judicata. We concluded that the interpretation of *Lone Wolf* there involved was fundamental to the decision and under the doctrine of res judicata, could not be challenged by us. We carefully left open the question whether, if untrammelled by res judicata, we would have construed *Lone Wolf* the same way. I, myself, would not have, and would be happy, now, to join in giving it a different and more sustainable construction, as the Congress now leaves us free to do. If, however, *Lone Wolf* holds what the 1942 Court of Claims thought it held, it still stands as an insuperable bar to the claim. To dispose of it, the Congress would have to excuse us from the duty of following Supreme Court decisions, which it has not yet done.

The day *Lone Wolf* was handed down, January 5, 1903, might be called one of the blackest days in the history of the American Indian, the Indians' Dred Scott decision. To the practical statesman, it appeared to say the Indian tribes had acquired no rights by treaty which the Congress was bound to respect. Certainly no U. S. Supreme Court

post 1938 would make such a decision, and many decisions, both earlier and later, give Indian treaties an entirely different degree of respect. But the case must be carefully read to avoid making it worse than it is. It has never been expressly overruled. We and other constitutionally "inferior" courts are not allowed to overrule Supreme Court decisions the Supreme Court has not itself expressly overruled. *United States v. Mason*, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). We are not required to praise them, nor to extend them beyond their precise holdings.

We must turn to *Lone Wolf*, therefore, as the 1942 Court of Claims did and the present court purportedly does (though to opposite results) and see what *Lone Wolf* really holds. Incidentally, since this court is deciding that the 1942 court was in error in its application of *Lone Wolf*, one might have expected some discussion of the 1942 decision and how it fell into the error it did. The 1942 decision clearly treated *Lone Wolf* as fully applicable as a precedent to a fifth amendment claim for just compensation, and imputed to that case a holding that in managing Indian property, Congress might exchange lands for money at any rate it chose, without its being an instance of uncompensated expropriation.

Many takers, including the United States, have sovereign immunity to unconsented suits. *Naganab v. Hitchcock*, 202 U.S. 473, 26 S.Ct. 667, 50 L.Ed. 1113 (1906). Thus the owner of property taken by the United States has no remedy by suit at law for just compensation, except for the consents it has given. These include the 40 U.S.C. § 257 procedure for condemnation of land, and the Tucker Act, now 28 U.S.C. § 1491. Where some such consent is not applicable, the landowner has no remedy except to resort to equity to enjoin the taking until just compensation or a means of adjudicating just compensation, is provided. Such suits are not so common now but in the days when consents by our states and our nation were not so sweeping as they now are, they were very common. *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 39 S.Ct.

185, 63 L.Ed. 504 (1919), is an example of a successful injunction suit by Indians against uncompensated expropriation of their lands. *See* II Nichols, Eminent Domain (2d ed. 1921) § 472, *Injunction Against Unlawful Taking or Damage Under Color of Eminent Domain*. *Hurley v. Kinkaid*, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932) may be taken as an example of an injunction suit where the government threatened to take but failed to provide just compensation, and that landowner lost in the Supreme Court because, unlike the Indians, he had a remedy at law under the Tucker Act.

When we realize that the Tucker Act as it then was, 24 Stat. 505, did not consent to suits by Indian tribes "founded on the Constitution" we will see that plaintiff Lone Wolf and co-plaintiffs were in precisely the situation for which the injunctive remedy was the only one available. They alleged that an Act of Congress infringed their property interests, but made no provision for just compensation, and general legislation such as the Tucker Act at that time made none. Thus it was irrelevant whether plaintiffs would have preferred the *status quo*, or just compensation for the altering of it: in either case their sole remedy was in equity. They clearly did invoke the fifth amendment, and they clearly did assert the government was taking, or threatened to take, their property. They did not assert any other ground why the challenged statute was unconstitutional. That they said the statute would deprive them of their lands "without due process of law" instead of "without just compensation," is a semantic variation that will not suffice to alter the entire nature of the *Lone Wolf* proceeding in the manner this court would like. They were not asserting a procedural error; in those days due process had substantive applications. Shortly before *Lone Wolf*, the Supreme Court held that the due process clause of the fourteenth amendment imposed on the states an obligation to pay just compensation in taking cases, despite its not including any specific just compensation clause. *Chicago, Burlington and Quincy R. R. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). This case overruled

*Davidson v. New Orleans*, 96 U.S. 97, 24 L.Ed. 616, 105 (1877), which had limited the application of the fourteenth amendment to procedural due process so far as concerned state eminent domain. We must understand these matters to understand *Lone Wolf*.

*Lone Wolf* is purely and simply a holding that the fifth amendment does not require just compensation to the Indians in the situation then before the Court. Thus our 1942 court was correct in viewing *Lone Wolf* as a precedent fully as applicable in a consented suit for just compensation, such as they had before them, as it would be in an injunction suit in the absence of the necessary consent. *Lone Wolf* was also viewed as an applicable precedent as to a just compensation claim as late as *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 390 F.2d 686, 182 Ct.Cl. 543 (1968), so far as applied to instances where the government made a "good faith effort" to give the Indians the full value of their land, though it was not judicially ascertained as the fifth amendment, if applicable, would have required. In such a case there was no taking even if the compensation was insufficient. In instances where we could see no "good faith effort," *Lone Wolf* was not viewed as a governing precedent, but no such reason for distinguishing it was suggested, as is now asserted. We quoted *Lone Wolf* to the effect that a mere change in the form of investment of Indian tribal property from land to money was not a taking. If *Lone Wolf* was not applicable to just compensation claims at all, much cerebral effort was wasted on it in the *Fort Berthold* case.

*Lone Wolf* did undoubtedly say that when Congress "purported" (the Court's word, 187 U.S. at p. 568, 23 S.Ct. 216) to give an adequate consideration in any such exchange, it was not permissible to go behind its fact finding to ask if the consideration really was adequate, nor could the Court inquire into the evil motives that might be secretly lurking in congressional breasts. The latter proposition has not changed in recent times. Thus in *United*

*States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), it was held that when it is necessary for construction of legislation to determine its intent and purpose, that is to be done by resort to sources such as committee reports, where the Congress makes its purpose manifest. It is not permissible to strike down legislation "on the basis of an alleged illicit legislative motive." *Id.* at 383, 88 S.Ct. at 1682, citing cases. In that case the alleged illicit motive was assertedly proved from member's speeches on the floor, which the Court held could not be imputed to the whole body. Plaintiff O'Brien did not even assert that it might be done by their off-the-record remarks.

The meaning both of *Lone Wolf* and of *O'Brien* is that if the Congress spreads evidence on the public record, *i. e.,* "purports" to act in a fair and constitutional manner, this may not be refuted by unsupported inference, by gossip, or by hearsay.

As a matter of history, it may be noted that the Indians in *Fort Berthold, supra,* took this court's "good faith effort" standard as an invitation to impugn the good faith of Congress in further remanded stages of the same case. The Indian Claims Commission rejected such evidence, 28 Ind. Cl.Comm. 264 (1972), as did we on appeal. *Three Affiliated Tribes of the Fort Berthold Reservation v. United States,* 204 Ct.Cl. 831, *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974). So the "good faith effort" standard must be applied with respect to the legislative record as publicly disclosed in the statutory language, committee reports, etc. The "good faith effort" standard is met in *Lone Wolf,* where the record shows that the Indians' complaints were considered by Congress and that an effort was made to meet them half way, the deal originally proposed for the Indians being materially improved in the final act. In long subsequent Indian Claims Commission proceedings it was held that under the legislation the government acquired at 93.3 cents an acre land worth $2 an acre. *United States v. Kiowa, Comanche and Apache Tribes,* 163 F.Supp. 603, 143 Ct.Cl. 534 (1958) *cert. denied,* 359 U.S. 934,

79 S.Ct. 650, 3 L.Ed.2d 636 (1959). However, in *Fort Berthold, supra,* there was likewise a gap between what the United States paid and the Commission determined; a greater one than in *Lone Wolf.* So it is clear the occurrence of a "good faith effort" is not to be tested by the congruence of the amount paid with the amount subsequently found by hindsight as what should have been paid.

In *Lane v. Pueblo of Santa Rosa, supra,* 249 U.S. at 113, 39 S.Ct. at 186, the Supreme Court said:

> The defendants assert with much earnestness that the Indians of this pueblo are wards of the United States—recognized as such by the legislative and executive departments—and that in consequence the disposal of their lands is not within their own control, but subject to such regulations as Congress may prescribe for their benefit and protection. Assuming, without so deciding, that this is all true, we think it has no real bearing on the point we are considering. Certainly it would not justify the defendants in treating the lands of these Indians—to which, according to the bill, they have a complete and perfect title—as public lands of the United States and disposing of the same under the public land laws. That would not be an exercise of guardianship, but an act of confiscation. * * [Footnote omitted, cites *Lone Wolf v. Hitchcock,* with other cases.]

In a consented suit, before *Lone Wolf,* the Supreme Court held the government accountable for selling to homesteaders land granted by treaty to Indians. *New York Indians v. United States,* 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927 (1898); 173 U.S. 464, 19 S.Ct. 487, 43 L.Ed. 769 (1899). *Lone Wolf* is not and never was to be read as sanctioning any arbitrary move the Congress may choose to make with respect to property rights of Indians created by an Indian treaty. It sanctions, as not violative of the fifth amendment, only such moves as are "purported" (*i. e.,* shown by the published record) to provide an "adequate consideration" in any exchange of lands for any-

thing else. I think this court in 1942 failed to note this limitation on the scope of the *Lone Wolf* holding and thus it committed error. The error does not bind us by res judicata, and I think the new analysis we now make, in the parts of the opinion I join, reveals a situation where Congress did not "purport" to provide "adequate consideration," nor was there any meaningful negotiation or arm's-length bargaining, nor did Congress consider it was paying a fair price. The case is not one we can say the *Lone Wolf* Court would deem no violation of the fifth amendment. It was never before the Court and we cannot tell how it would have viewed the case. The congressional decision fails the "good faith effort" test that we enunciated as explanatory of *Lone Wolf*.

BENNETT, Judge, with whom KUNZIG, Judge, joins, dissenting:

This court today has adjudged that the acquisition of the Black Hills from the Sioux Indians by the United States, pursuant to the Act of February 28, 1877, 19 Stat. 254, was a taking under the fifth amendment of the Constitution of the United States. By doing so, the court has concluded that the unanimous decision of the entire court in *Sioux Tribe of Indians v. United States*, 97 Ct.Cl. 613 (1942), *cert. denied*, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943), which held that the acquisition in question did not constitute a fifth amendment taking and that the Indians had already been paid, was incorrectly decided, although this result was later twice affirmed. *Sioux Tribe of Indians v. United States*, 146 F.Supp. 229 (Ct.Cl.1956), *vacated and remanded for further proof* (see 182 Ct.Cl. 912 (1968)); *United States v. Sioux Nation*, 518 F.2d 1298, 207 Ct.Cl. 234 (1975), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). In reaching this result, I believe that the majority has misconstrued the law as laid down by decisions of the United States Supreme Court.

The majority has placed its principal reliance on this court's decision in *Three Affiliated Tribes of Fort Berthold Reservation v. United States*, 390 F.2d 686, 182 Ct.Cl. 543 (1968), which held that the sole factor in determining whether Congress had taken Indian tribal land in violation of the fifth amendment was whether Congress had or had not made "a good faith effort to give the Indians the full value of the land." *Fort Berthold, supra*, 390 F.2d at 691, 182 Ct.Cl. at 553. Upon the basis of the history of the acquisition as depicted in the congressional records, the majority has found that Congress had not made such a good faith effort when it acquired the Black Hills from the Sioux. Further, the majority, in following *Fort Berthold's* test, contends that the Supreme Court's decision in *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), has no relevance to the question of a fifth amendment taking of Indian tribal land. I respectfully disagree.

Decision of this case requires a careful examination of the scope of the pertinent Supreme Court precedents in this area. The first is *Lone Wolf v. Hitchcock, supra*, and, initially, I note my agreement with the view expressed in Judge Nichols' concurring opinion, contrary to the reasoning of the court's opinion, that *Lone Wolf* is a precedent applicable to a suit brought for just compensation for an alleged taking of Indian tribal property and that Congress has not excused us from following it. The underlying facts of that case, which the majority admits "were somewhat similar to those here," were as follows. The Indian tribes' rights in certain lands, set apart for them in a reservation, had been recognized in a treaty with the United States. The treaty provided that these lands could not be disposed of without the consent of three-fourths of the tribes' members. Congress negotiated an agreement with the tribes for the allotment of land to individual Indians and the sale of unallotted or surplus lands to settlers. Congress became aware that the requisite number of Indians had not signed the agreement. The Indians protested to Congress that their agreement had been obtained by fraudulent misrepresentations and false promises and that they had been promised much more for the surplus lands by the agents of the Government than the agreement allowed. The agreement,

however, with several modifications, but without any change in the amount of compensation for the surplus lands, was enacted by Congress into law.

The Indians immediately went to court seeking an injunction restraining the Government from carrying out an unconstitutional deprivation of property rights. The Indians alleged that the value the statute assigned to the surplus lands was far below the land's actual value and that the statute, if carried out, would result in an unconstitutional taking of their property rights and would deprive the Indians of their property rights without due process of law.

The Court sustained the constitutionality of the statute under Congress' plenary authority over Indian affairs.[1] The Court held that the exercise of plenary authority was deemed political, not subject to control by the judiciary. Thus, the Court would not and could not examine the charges that Congress had wrongfully exercised its power.

I believe that Judge Nichols, in his concurring opinion, has properly stressed the importance of placing old cases within their historical perspective in order to understand just what in fact they held so that their implications can be properly assessed. *Lone Wolf's* ruling on due process has substantive aspects which directly relate to the "taking" clause of the fifth amendment as it relates to Indian tribal land.

The due process clause, "nor [shall any person] be deprived of life, liberty, or property, without due process of law," is broader than the eminent domain clause of the fifth amendment, "nor shall private property be taken for public use, without just compensation," and necessarily includes the more specific part. I Nichols, Eminent Domain § 4.3 (3d ed. 1976). A holding that a statute does not violate due process implic-

itly includes the holding that the eminent domain clause has not been violated.

A difference between the eminent domain and due process protections of significance here is that the eminent domain clause is a *restriction* on government's inherent power to take property for *public* use; whereas due process is also a *prohibition* on the Government from taking property for *private* use of third parties. I Nichols, *supra* ¶ 4.7. This may very well explain why plaintiffs in *Lone Wolf* grounded their claim on the due process clause, for the purpose of the appropriation, sale of the tribal land to settlers, might well be considered a private use. Both under eminent domain and due process, however, when the illegal act is already accomplished and cannot be prevented, the plaintiff is entitled to just compensation which includes interest.

There was, however, no discussion in *Lone Wolf* of the relation between due process and Congress' plenary power over Indian affairs. The Court simply concluded that the statute was supported by Congress' plenary power which "has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock, supra*, 187 U.S. at 565, 23 S.Ct. at 221. The Court "must presume that Congress acted in perfect good faith * * *. *In any event*, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation." [Emphasis added.] *Id.* at 568, 23 S.Ct. at 222. The sense of the opinion seems to be that Indian tribal property is simply not protected by the fifth amendment. It may be that the thought then was that due process protects only "persons" and "private property" and that Indian tribes were not "persons"

---

1. The only provision in the Constitution specifically dealing with Indians is found in U.S. Const. art. I, § 8, cl. 3, which grants Congress the power:

 "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

In *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), however, the Court recognized that the Federal Government's power over Indian affairs is broader than this provision, being derived from the inherent duty to protect and foster these dependent people.

and Indian tribal property, owned communally, was not private property. *See Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), and *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183 (1902), for the relevance of the distinction between individual Indian land versus Indian tribal land as it relates to due process. What the majority fails to consider is that *Lone Wolf* held that it was within Congress' constitutional power to dispose of tribal property without regard to good faith or the amount of compensation.

Subsequent to *Lone Wolf*, the Supreme Court did recognize that the power of Congress to dispose of Indian tribal property was subject to the fifth amendment. *See United States v. Klamath & Moadoc Tribes*, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); *Shoshone Tribe v. United States*, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *United States v. Creek Nation*, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1919). In *Pueblo of Santa Rosa*, the Indians sought an injunction to prevent the Secretary of the Interior from selling certain lands as public lands to settlers, which lands were claimed by the Indians under title recognized by the United States. The Court ruled that there would be a threatened unconstitutional taking and that the Indians would be entitled to an injunction if Congress had recognized the Indians' title to the lands in question, and the Court remanded the case for a determination of that issue.[2] In *Creek Nation*, certain tribal lands were classified as public lands by an erroneous survey and were sold by the United States to settlers. With full knowledge of the facts, the United States refused to cancel the sales and retained all the benefits it had received from the sales. In *Shoshone Tribe*, Government agents gave tribal lands to other Indians. Congress later ratified this tortious act and recognized the other Indians' title. In *Klamath and Moadoc Tribes*, the United States gave individual Indian lands to a

state government for roads. Realizing its mistake, the United States transferred Indian tribal lands to the state in exchange for the individual Indian lands. Several years later, the United States paid the tribes some money for the release of their claim. Two cases with similar facts can be added to this collection—*Uintah and White River Bands of Ute Indians v. United States*, 152 F.Supp. 953, 139 Ct.Cl. 1 (1957), and *Seminole Nation v. United States*, 102 Ct.Cl. 565 (1944), *cert. denied*, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945). Thus, a similar fact pattern emerges in every case: at the time Indian tribal land was appropriated (or appropriation was threatened) by the United States, tribal land was treated as if it had been the United States' own and no compensation of any form was rendered or even contemplated. The majority, in attempting to support its position, denies this fact by claiming that the Supreme Court has found a taking in one case where some compensation was paid at the time of the acquisition. The majority states:

> This has been done where no compensation was originally paid and where the initial compensation was grossly inadequate.[7]

[7] In *United States v. Klamath and Moadoc Tribes of Indians*, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938), the United States paid $108,750 in related parts of a single transaction (*see Klamath and Moadoc Tribes v. United States*, 85 Ct.Cl. 451, 457–58 (1937) for Indian land which this court later found to have been worth $2,980,000. The Supreme Court held that there was a constitutional taking for which just compensation had to be paid, including interest. *See* 304 U.S. at 122, 123–25, 58 S.Ct. 799.

The statement is correct where it says that the Supreme Court has found a taking "where no consideration was originally paid" at the time of the appropriation of land.

The second proposition stated that the Supreme Court has required payment for a taking "where the initial compensation was grossly inadequate," is bolstered by the

[2.] It is well settled that Indians have a protected property interest only in lands held under title recognized by the United States and not for

lands held under aboriginal title. *See, e.g., Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955).

cites to *United States v. Klamath and Moadoc Tribes of Indians*, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938), and *Klamath and Moadoc Tribes v. United States*, 85 Ct.Cl. 451, 457–58 (1937), and the statement that "the United States paid $108,750 in related parts of a single transaction * * * for Indian land." In other words, the taking and payment are suggested to have been just one big transaction and that the United States paid the tribes some compensation at the time of the acquisition.

The facts as found by the Court of Claims do not bear out this conclusion at all. *Klamath and Moadoc Tribes v. United States*, 85 Ct.Cl. 451, 457–58 (1937). On June 21, 1906, Congress authorized the Secretary of the Interior to give Indian tribal lands in exchange for individual Indian lands it had improperly sold to third parties many years before. The Secretary did convey these lands on August 22, 1906 (the date of taking). "This was done without the knowledge or consent of the plaintiffs *and without making compensation*." [Emphasis added.] *Id.* at 457. *Thereafter*, on November 2, 1907, the Secretary recommended that $108,750 be appropriated " 'to compensate them for the lands taken.' " *Id.* at 457. Prodded by this recommendation the Congress on April 30, 1908, did appropriate that sum " 'or so much thereof as may be necessary, to pay the Indians * * * for the lands.' " Such payment was conditioned, however, upon an execution by the Indians of " 'a release of any claims and demands of every kind against the United States for the land involved.' " *Id.* at 458; 35 Stat. 70, 92 (1908).

As summarized by the Supreme Court, "[t]hat transfer [the transfer of the tribal lands] was made without the knowledge or consent of plaintiffs and *without giving them any compensation* for the lands so taken from their reservation. *Later*, however, the United States paid them *$108,750 for which they released their claim*." [Emphasis added.] *United States v. Klamath and Moadoc Tribes, supra*, 304 U.S. at 122, 58 S.Ct. at 801.

The actions of Congress were thus not a single transaction but discrete, separate acts, evidenced by separate statutes and developments mentioned in the findings. Compensation was neither rendered nor was any obligation to render any compensation assumed when Congress gave the land in question to others. Therefore, the precedents given do not support the proposition for which they are used. The cases simply stand for the reasonable rule that Congress cannot prevent the legal consequences of its acts by rendering compensation well after the fact, if that payment is not just compensation.

In each of these cases, the courts held that the Government was required to pay just compensation for the taking of Indian tribal property, which was held by recognized title. The Supreme Court did not deny that Congress had plenary authority over Indian tribal property, but found that the exercise of this power was subject to constitutional restraints. The fullest exposition of this doctrine is found in *United States v. Creek Nation, supra*, 295 U.S. at 109–10, 55 S.Ct. at 684, where it said:

> * * * The tribe was a dependent Indian community under the guardianship of the United States, and therefore its property and affairs were subject to the control and management of that government. But this power to control and manage was not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it was subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions. It did not enable the United States to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them; for that "would not be an exercise of guardianship, but an act of confiscation." *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113, [39 S.Ct. 185, 186, 63 L.Ed. 504]; *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 307–308 [, 23 S.Ct. 115, 47 L.Ed. 183].

It is within the framework of these opinions that this court decided *Three Affiliated Tribes of the Fort Berthold Reservation v. United States, supra,* which is the basis of the majority's decision that the acquisition of the Black Hills was a compensable taking under the fifth amendment. *Fort Berthold* attempted the difficult task of reconciling the various precedents in the area. The court concluded that the question to be determined was whether Congress, in disposing of tribal property, was exercising its power of eminent domain or its plenary power.

It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time. [390 F.2d at 691, 182 Ct.Cl. at 553.]

The court examined the pertinent precedents to find a clue to a standard by which the court could determine which "hat" Congress was wearing. Looking at the factual situation presented in *Lone Wolf,* the court found that Congress had made a good faith effort to give the Indians fair value for their lands. Thus, the court concluded that it must be the presence of this effort that made the disposition an exercise of plenary power and not a taking. Looking at the factual situations presented in the precedents that had found a taking, the court noted the absence of a good faith effort to give the Indians fair value for their lands. Concomitantly, the court decided that the absence of this effort indicates an exercise of the power of eminent domain. In essence, the court concluded that the elusive presence of this good faith effort as found on the facts of *Lone Wolf,* showed that Congress was acting as a guardian of Indian affairs. The absence of facts similar to those of *Lone Wolf* demonstrated that Congress was acting as a taker. The factual situations presented in *Pueblo of Santa Rosa* and its progeny, however, are poles apart from that of *Lone Wolf,* and the good faith effort standard does not adequately deal with the disparity of the facts nor with the legal distinctions present therein.

The cases which actually held that there had been a taking must be examined both for the Court's legal approach and its relation to the facts before the Court. In *Creek Nation,* the Court simply stated that the exercise of plenary power is subject to constitutional restrictions. Such could be read very expansively, *i. e.,* that Congress can never deprive Indian tribes of their property without rendering or assuming the obligation to render just compensation. In light of the fact that the Court never overruled, limited, or distinguished *Lone Wolf,* however, such a broad interpretation is clearly unwarranted. Viewing the specific facts of the cases, we know only that an unconstitutional taking occurs when the land is treated as if it were the property of the United States without any regard or recognition of the property rights of the Indian tribes.

Once the United States recognizes that certain property belongs to Indian tribes, and that the United States must acquire it from those tribes and provide the tribes with something in return, as was the case in *Fort Berthold* and in our instant case, *Pueblo of Santa Rosa* and its progeny simply do not answer the question of whether there has been a taking. *Fort Berthold* postulates that a court may examine the good faith of Congress in acquiring the property to determine if a taking has occurred. Application of such a standard is at odds with *Lone Wolf,* which clearly provided that though there was a moral obligation to act in good faith, since "Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation." *Lone Wolf v. Hitchcock, supra,* 187 U.S. at 568, 23 S.Ct. at 222. *Fort Berthold* adopts a standard of review that would overrule

*Lone Wolf,* and this cannot be done by a lower court.

The majority, however, solves this problem by simply contending that *Lone Wolf* has nothing to do with the taking clause. The majority is the first court to do this. Illogically, however, the majority has adopted the *Fort Berthold* standard which was derived from a review of pertinent taking precedents, of which *Lone Wolf* was one. Further, I believe that the majority has shown its awareness of the hazards attendant to delving into the good faith and decision-making process of a past Congress by stressing, in its evaluation of the question of Congress' good faith in acquiring the Black Hills, the pronouncements of official legislative records. Carried to its logical extreme, if Congress "purports" in official records to give fair value, good faith is established no matter how insufficient the compensation was that Congress paid for the land.

The test laid down by *Fort Berthold* contradicts itself by its own terms. The court there provided:

> * * * Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of a trustee. * * * [390 F.2d at 691, 182 Ct.Cl. at 553.]

How can it be said that Congress is simply performing the traditional function of a trustee when it disposes of Indian tribal property for a grossly inadequate amount? This was the standard applied and found to be satisfied in *Fort Berthold* when Congress exchanged Indian tribal land for approximately 40 percent of its fair market value. Under *Fort Berthold's* analysis, good faith was found in *Lone Wolf* where in the follow-up case, *United States v. Kiowa, Comanche and Apache Tribes,* 143 Ct.Cl. 534, 166 F.Supp. 939 (1958), *cert. denied,* 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959), the amount paid in exchange was less than 50 percent of the land's fair market value.

The standard makes a mockery out of the fifth amendment protections it purports to extend to the tribes, making its effectiveness dependent on an abstract, insubstantial finding.

Nor has *Fort Berthold's* liberalized standard had much significance in forming the basis for judgments in favor of Indians up until this case. In *Fort Berthold* itself, the standard justified judgment for the Indians only on one claim out of many alleged. This was for land (school land) purchased by the United States at a fixed price per acre to be given to state governments for educational purposes. A member of *Fort Berthold's* majority in a later review of that case suggested that this holding was wrong. *Three Affiliated Tribes of Fort Berthold v. United States,* 204 Ct.Cl. 831, 833–34, *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974). In *Confederated Salish and Kootenai Tribes v. United States,* 193 Ct.Cl. 801, 437 F.2d 458 (1971), a similar holding on school lands was rendered on the basis of *Fort Berthold.* Also, a taking was found when the United States acquired land for a national bison range, had an independent appraisal of the land, and paid the full appraised value. I simply cannot see how this failed *Fort Berthold's* good faith test. In *Klamath and Modoc Tribes v. United States,* 193 Ct.Cl. 670, 436 F.2d 1008, *cert. denied sub nom. Anderson v. United States,* 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971), the defendant conceded that land acquired by the United States had been taken in violation of the Constitution. The court commented that the concession was correct because when the United States acquires for its own benefit it is always a taking. This dicta has been repudiated by the majority today and we agree. For, whether the United States acquires for itself or for third parties, it is the power of the United States that has made possible the unconsented appropriation. Thus, if we were to analyze *Klamath and Modoc Tribes* today as the majority would have us do, we would arrive at the startling result that when land is appraised and sold to third parties at the appraised value, good faith is

demonstrated, while if the United States pays that same appraised value, good faith is lacking.

The law the Supreme Court has laid down governing the legal rights of Indian tribes guaranteed by the fifth amendment is at best ambiguous. I believe that courts must be careful in construing ambiguous binding precedents where the results of liberal construction are enormous judgments against the United States. *Cf. United States v. Zazove*, 334 U.S. 602, 617, 68 S.Ct. 1284, 92 L.Ed. 1601 (1948); *Pine Hill Coal Co. v. United States*, 259 U.S. 191, 196, 42 S.Ct. 482, 66 L.Ed. 894 (1922); *Schellfeffer v. United States*, 170 Ct.Cl. 178, 343 F.2d 936 (1965). Though it is quite possible current popular attitudes concerning the relationship between due process and Congress' plenary power over Indian tribal property have changed in favor of the extension of the constitutional protections, it is not this court's function to advance these attitudes when such an approach cannot be implied without emasculation of Supreme Court precedents.[3] Further, *Fort Berthold* is an example of the unsatisfactory or illogical results that are reached when trying to liberalize ambiguous precedent, for the good faith test itself does not achieve a proper approach to the delicate relationship between due process and plenary power. Thus, *Fort Berthold* is not a proper statement of the law and should be overruled.

The law we should apply is that once Congress has, through negotiation or statute, recognized the Indian tribes' rights in the property, has disposed of it, and has given value to the Indians for it, that is the end of the matter. Courts should not and cannot investigate and rule on the good faith of Congress in enacting legislation, as the majority opinion does here. The separation-of-powers doctrine, bedrock of our Constitution, is offended by so doing. It would be the same if Congress questioned the good faith of this court's decisions. Of course, it will be contended that unless we can review the good faith of Congress in what it does we will be allowing it absolute power to ride roughshod over the Constitution. Constitutional questions, however, are not properly resolved by the fuzzy test of good faith. In this instance, Congress exercised its own oversight and recognized a breach of its moral obligations in 1877. Since 1946, when Congress established the Indian Claims Commission, it has made available a remedy to right moral wrongs to Indians. The Sioux Nation availed itself of that remedy to recover $17,553,484 for breach of the moral duty of Congress to them in this particular instance. We have affirmed that judgment. *United States v. Sioux Nation*, 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

The conclusion of the majority is that the disposition of the Black Hills in exchange for 900,000 acres of land and a promise to supply rations "until the Indians are able to support themselves," could not be an exercise of Congress' plenary power over Indian affairs to foster and protect these people because the official pronouncements of Congress do not explicitly demonstrate that it equated the value of the consideration with the value of the land. Thus, the court presumed utmost bad faith and indifference to the best interests of the Indians. The majority retreats somewhat from its sole reliance on official records as dispositive of Congress' good faith effort in asserting that "an essential element of the inquiry under the *Fort Berthold* guideline is determining the adequacy of the consideration the government gave for the Indian lands it acquired." Neither the Supreme Court nor the Court of Claims has ever examined the adequacy of the consideration given in exchange in order to determine if there has been a taking and this is directly contrary

---

3. The extreme to which the court goes in undoing the Supreme Court's decision in *Lone Wolf* is illustrated by its need to rely on a dissenting opinion of the Court of Claims where this issue was not even presented as authority to modify the *Lone Wolf* principle that courts cannot examine the adequacy of the consideration Congress gives for Indian lands taken. *United States v. Sioux Nation, supra*, 518 F.2d at 1307, 207 Ct.Cl. at 250.

to *Fort Berthold's* holding.[4] In any event, turning from official pronouncements to what Congress actually did, a much different picture emerges. Prior to the acquisition of the Black Hills, Congress had obligated itself by the treaty of 1868 to supply food to the Sioux for 4 years. The expenditure for these rations was over $5 million. Once this treaty obligation had ended, Congress continued gratuitously to supply food for fiscal years 1874 and 1875 at the cost of $2,350,000. In 1875, the Secretary of the Interior suggested that Congress might *continue* the rations in the future *in consideration* of certain property concessions by the tribes. It is significant that the report of the Committee on Indian Affairs of March 15, 1876, accompanied a bill which provided for the Allison Commission to negotiate with the Sioux for cession of the Black Hills in return for which the United States would provide the Indians with subsistence for not more than 10 years. Based on prior experience, at a cost of one and one-quarter million dollars a year, certainly the Senate committee contemplated a substantial consideration of around $12 million which could be committed to the Indians by the Allison Commission. This $12 million is not so far off from the value of the Black Hills found by the Indian Claims Commission in 1976.

Congress, therefore, was well aware of the past cost of the obligation to feed the Sioux and it is obvious that this cost was reasonable evidence to Congress of the magnitude of the obligation to supply rations. Congress, however, went far beyond the Senate committee's recommendation to supply food for 10 years and assumed an open-ended obligation in exchange for the Black Hills in the 1877 Act. The majority's view that the rations were not consideration for the Black Hills is untenable. What else was the money for? Such an obligation

by the United States Government, though it might be difficult to value in terms of the marketplace at that time, has been of inestimable value to the Indians. Performance of this promise spanned several generations and in dollar terms was many times the Indian Claims Commission's valuation of the lands acquired by the United States.[5] The court has admitted as much. Congress added to the Sioux reservation 900,000 acres of land as well, in exchange for the Black Hills. Where is there evidence showing that Congress did *not* believe, based on its judgment, that this exchange of land for food, rations, provisions, and other land was in the best interests of the Sioux? And yet, the majority determines that Congress was not properly exercising its plenary powers to foster and protect the Sioux in this instance, while it was in *Fort Berthold* and *Kiowa, Comanche and Apache Tribes*, where it exchanged tribal land for less than half of its fair market value!

The large judgment previously rendered in favor of the Sioux under the "fair and honorable" dealings section of the Indian Claims Commission Act, 25 U.S.C. §§ 70–70w, was for the *full* value of the Black Hills and other claims. Congress, by legislation, 88 Stat. 1499, 1500 (1974), 92 Stat. 153 (1978), has provided that the value of the food, rations, and provisions, which are otherwise properly an offset to this judgment, will not be taken into consideration as payment on the claims. The court goes another step and quite properly declares that, while there can be no such offset, the same statutes do not bar the cost of food, rations, and provisions from being treated as consideration for the land, though it improperly, I think, concludes that these millions were not consideration. Thus, under statutory authority, the Sioux tribes are entitled to, and will receive, $17,553,484, which was the amount granted by the 1976

---

4. *See* note 3 *supra*.

5. An 8-volume report by the General Accounting Office, numbering over 4,300 pages, accounts for over $109 million disbursed to the Sioux up to June 30, 1925. Of this amount, $36,930,367 represented charges against the 1877 Act and, in addition, there was almost $16 million in gratuities. The record before us does not bring these costs up to date. The majority opinion states that the Government has expended $43 million on rations and provisions for the Sioux but does not state for what period. Defendant uses a figure of $57 million.

judgment of the commission, affirmed by this court. However, Congress has never permitted the award of interest on such statutory or moral claims, though it certainly could have. Therefore, this court is only authorized to grant interest on the claim upon a finding of a constitutional violation under decisional law. The court now holds, based on very ambiguous precedent, that the Indians are entitled to extra compensation in the form of simple interest at the rate of 5 percent for over 102 years for a "taking." This results in a staggering judgment of approximately $105,000,000. Such a judgment is the product of a distorted conception of the precedents, as I have shown.

A proper result reached by strict application of the Supreme Court's decisions, which would determine that the claim is solely statutory, would not prevent these Indians from receiving a major judgment for a moral claim. This is not a case where the court must stretch in order that plaintiffs can recover at all. The circumstance which demonstrates a clear wrong in terms of today's perceptions of what is moral, fair, and honorable, presented here a claim under the Indian Claims Commission Act on which the Indians have prevailed. If Congress thinks that plaintiffs are entitled to more money for the wrong their ancestors suffered, it can make such an award as a gratuity. This would be in further hindsight redress of its behavior 102 years ago in exercise of its plenary powers to bring peace to the Black Hills under difficult circumstances we can today hardly appreciate. But, there is just no clear and reliable precedent for the court to find a taking, which would provide plaintiffs approximately $90 million additional in interest, as a matter of law. The court has said before, in well-considered opinions which the Supreme Court declined to review, that there was no taking here. The facts have not changed. We have been offered no new evidence. There is no justification for appearing to yield now to pressure in this matter to cloak an award with the trappings of judicial authority that does not clearly exist. The separation of powers militates against it. I reject the court's holding that its result is legally mandated. Plaintiffs have been paid twice on their claim: first, by the 1876–77 Congress and its successors in providing the huge subsistence payments and, second, by being given full value for their rights in a judgment by the Indian Claims Commission, which we have affirmed, and the defendant does not now contest.

For all of these reasons, I respectfully dissent from the opinion and judgment of the court, except for part V of the opinion which rejects plaintiffs' claim that removal of gold by trespassing miners was a taking by, or ratified by, the United States.